[No. 557.   Decided July 11, 1892.]

*In the Matter of the Estate of Hiram C. McLaughlin, Deceased:* NORMAN F. HESSELTINE, *Appellant*, v. RUTH A. McLAUGHLIN, *Respondent*.

MARRIAGE—COMPLIANCE WITH STATUTES NECESSARY TO VALIDITY.

Under the statutes of this state regulating marriage (Gen. Stat., §§ 1381–1396) an agreement between parties to live together as husband and wife is ineffective to establish that relation.

*Appeal from Superior Court, King County.*

*John G. Barnes,* and *Norman F. Hesseltine,* for appellant.

*Trusten P. Dyer,* and *Thompson, Edson & Humphries,* for respondent.

The opinion of the court was delivered by

SCOTT, J.—On the 12th day of December, 1891, Hiram C. McLaughlin died intestate at La Grande, in the State of Oregon.   He was a citizen of this state, residing at Seattle, and left personal property to the amount of about five thousand dollars in King county.   He had a daughter over twenty-one years old, whose mother is not now living, and this daughter claims to be the only heir.   One Ruth A. McLaughlin, with whom he was living at the time of his death, claims to be his wife by a marriage under the common law.   She was married to Hiram C. McLaughlin on the 13th day of August, 1887, by a judge of probate, at Tacoma, in this state.   At that time she had another husband living by the name of Van Every.   There was some testimony to show that at the time she was married to McLaughlin she believed Van Every was dead.   She continued to live with McLaughlin as his wife until July, 1890, at which time she received information that her first hus-

band was still living, whereupon she and McLaughlin separated, and divorce proceedings were instituted by her against Van Every, wherein she obtained a divorce from him in January, 1891. Whereupon she and McLaughlin resumed their former relations, although no marriage ceremony was ever performed between them subsequent to the time she obtained a divorce from Van Every. There is testimony to show that she and McLaughlin continued to live together as husband and wife up to the time of his death; that they held themselves out to the public as husband and wife, and believed themselves to be such, and believed no marriage ceremony was required to render the marriage valid. There was some testimony to contradict this state of affairs, and to show they did not regard themselves as husband and wife. It appears that at one time while they were living together, prior to her obtaining the divorce from Van Every, she left McLaughlin and was gone some time, and he had no knowledge of her whereabouts for some weeks; that he subsequently found her at Tacoma, and instituted criminal proceedings against her for some purpose which the evidence does not make clear. These difficulties seem to have been adjusted, however, and the parties resumed their former relationship up to the time the proof shows that she discovered that Van Every was still living. Upon the death of McLaughlin, Norman F. Hesseltine, the appellant, who was holding a power of attorney from Bertha McLaughlin authorizing him to represent her in the settlement of the estate, petitioned the superior court of King county for letters of administration. Said Ruth A. McLaughlin also petitioned said court, as the widow of said Hiram C. McLaughlin, for the appointment of one Frank A. Pontius as administrator. On the 15th day of January, 1892, said court appointed one John Fairfield special administrator. On the 4th day of February following said court found, upon a trial of the rights of the

parties, that said Ruth A. McLaughlin was the widow of deceased, as she claimed, and was entitled to have letters of administration issue to the person whom she had requested to have appointed in her petition, and a decree was entered granting her petition. From this finding and decree an appeal was taken to this court, the said John Fairfield continuing as such administrator pending the appeal.

Several questions are presented by the appellant, one of which is that there can be no such thing as a common law marriage in this state; that under our statutory regulations a marriage ceremony must be performed in one of the ways pointed out by the statute in order to render a marriage valid. Another one is that the proof is entirely insufficient to establish the marriage relationship between said parties, even though they could become husband and wife by a mere agreement between themselves as at the common law, according to some holdings. Under the view we have taken of the first point raised, we do not find it necessary to pass upon the sufficiency of the evidence, as, after a careful consideration of all the authorities we have been able to find upon this subject, we have come to the conclusion that the first point made by the appellant is well taken. We find this to be the case with some hesitancy, for the greater number of adjudicated cases in this country hold the parties may contract the marriage relationship by an agreement between themselves. In most of the states the statutory provisions upon the subject of marriage have been held directory only, and where there was no express provision in the statutes declaring all marriages void other than those contracted in some one of the ways provided by the statute that the parties could become husband and wife by a mutual agreement. Mr. Bishop lays down the doctrine very strongly that unless such a marriage is absolutely prohibited by the express language of the statute, that it should be sustained, and that evidence of cohabita-

tion and of the parties holding themselves out to the public as husband and wife, should be sufficient to establish the relation in all cases.

In *Hutchins v. Kimmell*, 31 Mich. 126, 18 Am. Rep. 164, Cooley, J., in rendering the opinion of the court, says:

"Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations. This has become the settled doctrine of the American courts; the few cases of dissent or apparent dissent being borne down by a great weight of authority in favor of the rule as we have stated it."

In *Meister v. Moore*, 96 U. S. 78, Mr. Justice Strong, in delivering the opinion of the court, said:

"Marriage is everywhere regarded as a civil contract. Statutes in many of the states, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence they are not within the principle, that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common law right; but there is always a presumption that the legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common law right to form the marriage relation by words of present assent. . . . In many of the states enactments exist very similar to the Michigan statute; but their object has manifestly been, not to declare what shall be requisite to the validity of a marriage, but

to provide a legitimate mode of solemnizing it. They speak of the celebration of its rite rather than of its validity, and they address themselves principally to the functionaries they authorize to perform the ceremony. In most cases, the leading purpose is to secure a registration of marriages, and evidence by which marriages may be proved; for example, by certificate of a clergyman or magistrate, or by an exemplification of the registry. In a small number of the states, it must be admitted, such statutes have been construed as denying validity to marriages not formed according to the statutory directions. Notably has this been so in North Carolina and in Tennessee, where the statute of North Carolina was in force. But the statute contained a provision declaring null and void all marriages solemnized as directed, without a license first had. So, in Massachusetts, it was early decided that a statute very like the Michigan statute rendered illegal a marriage which would have been good at common law, but which was not entered into in the manner directed by the written law. . . . In *Parton v. Harvey* (1 Gray [Mass.] 119), where the question was whether the marriage of a girl only thirteen years old, married without parental consent, was a valid marriage (the statute prohibiting clergymen and magistrates from solemnizing marriages of females under eighteen, without the consent of parents or guardians), the court held it good and binding, notwithstanding the statute. . . .

"As before remarked, the statutes are held merely directory; because marriage is a thing of common right, because it is the policy of the state to encourage it, and because, as has sometimes been said, any other construction would compel holding illegitimate the offspring of many parents conscious of no violation of law."

The learned judge, however, said:

"It is unnecessary, however, to pursue this line of thought. If there has been a construction given to the statute by the supreme court of Michigan, that construction must, in this case, be controlling with us. And we think the meaning and effect of the statute has been declared by that court in the case of *Hutchins v. Kimmell*, 31 Mich.

126, 18 Am. Rep. 164, a case decided on the 13th of January, 1875. There, it is true, the direct question was, whether a marriage had been effected in a foreign country. But, in considering it, the court found it necessary to declare what the law of the state was;" and gives the quotation above given from that case, with a statement that it cannot be regarded as mere *obiter dicta*.

In the case of *Askew v. Dupree*, 30 Ga. 173, marriage was held to be a civil contract, and LUMPKIN, J., says:

"If a contract be made *per verba de præsenti*, and remains without cohabitation, or if made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary, and which the parties (being competent as to age and consent) cannot dissolve. . . . That acts in relation to the solemnization of marriages were not generally construed as in the case of acts relating to general subjects because marriage was essentially distinguished from every other species of contract, whether of legislative or judicial determination; that this distinction has been universally admitted; that not only is all legal presumption in favor of the validity and against the nullity of marriage, but it is so on this principle, that a legislative enactment to annul a marriage *de facto* is a penal enactment, not only penal to the parties, but highly penal to the innocent offspring, and, therefore, to be construed according to the acknowledged rule most strictly. . . .

"After the marriage relation is entered into, it is then considered in the light of a civil institution, in which the state itself has an interest, as well as the parties. And the interest of the state is that these contracts shall be permanent, and not revocable at the will and pleasure of the parties; that parents may be held responsible for the support, maintenance and education of their offspring, and that the legitimacy of their offspring may be known and established beyond dispute. . . .

"The conclusions to be deduced from the whole matter are these: That marriage is founded in the law of nature, and is anterior to all human law; that in society it is a civil contract; that if the contract is *per verba de præsenti*—that is, I take you to be my wife, and I take you to be my hus-

band—though it be not consummated by cohabitation, or if it be made *per verba de futuro*, and be consummated, it amounts to a valid marriage, in the absence of all munici- pal regulations to the contrary; and that notwithstanding there be statutes directing a license to issue, as in this state, and inflicting a penalty on any minister or magistrate who shall unite the parties in wedlock, without such license, yet, in the absence of any positive enactment declaring that all marriages not celebrated in the prescribed form shall be void, a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enact- ment, is still a valid marriage. . . . In this state, no marriage, within our knowledge, has been declared a nullity because the statutory regulations were not complied with, and while the law inflicts penalties upon the celebrator, it has cautiously abstained from interfering with the marriage itself. For myself, I approve the law as it is. True, it will be sometimes abused. What human institution is not? Rarely, however, will the parties forego the benefits result- ing from a compliance with the statutes. It adds so much both to the respectability, as well as the security, of the contract. I have never known of a self-solemnized mar- riage. But, suppose such should occur; better, far, for the parties, especially the female, that the law should be as it is. Her honor is saved, and this is worth more than ev- erything, even life itself. All other contracts may be re- scinded, and the parties restored to their former condition; marriage cannot be undone.

"Why does this law, in utter disregard of what seems to be the usual protection and restraint, thrown around the inexperience and imprudency of infancy, allow infants— the male at fourteen and the female at twelve—to enter into the binding contract of marriage? It is at this age the sexual passions are usually developed, and the law, with a wise forethought, looking beyond exceptional cases, and to the general interests of society, to guard against the mani- fold evils which would result from illicit intercourse, de- clares even infants capable of forming this relation."

It was contended by the appellant that the sections of our code which prescribe how marriage shall be solem-

nized, and which also make the exception that all marriages shall be deemed to be valid although the ceremony is performed by a person not authorized by law to perform it, preclude the contracting of the relationship in any other manner than as provided; that the legislature having made a provision specially legalizing marriages in certain excepted cases, must be held to have contemplated all others not entered into according to the manner provided by the statute, and not within the exceptions, as void. We find very similar provisions, however, in other states, and undoubtedly it is the case in the most of them where the validity of common law marriages is recognized, and the argument loses something of its force in consequence of this.

The position taken by the appellant is directly sustained in the case of *Beverlin v. Beverlin,* 29 W. Va. 732, in which state marriages at the common law were held to be abrogated, and the decision was put upon this very ground that the legislature had provided a method for contracting the marriage relationship, and had specially excepted those cases and declared them valid, notwithstanding the ceremony was performed by some person not authorized as by law required. In that case, SNYDER, J., says:

"There is much controversy as to what constitutes a common law marriage. It always has been, and still is, a doubtful question in England. In the American states, where such marriages have been recognized and held valid, there is considerable diversity as to their requisites. In North Carolina, Tennessee, Massachusetts, Maine and Maryland, some ceremony or celebration seems to be necessary to a valid common law marriage, and in most or all of these states it has been questioned whether or not the statutes have not superseded common law marriages. and that a marriage to be valid must be in accordance with the statutes. . . . In New York it has been held that no religious form or ceremomy of any kind is essential to the

validity of the marriage—all that is required in that state is, that the parties should be capable of contracting, and that they should *actually contract* to be man and wife. ⸳ . . In Pennsylvania it has been decided, that 'marriage is in law a civil contract, not requiring any particular form of solemnization before the officers of church or state, but must be evidenced by words in the present tense, uttered for the purpose of establishing the relation of husband and wife, and should be proved by the signature of the parties or by witnesses present when made; therefore, when the evidence of the contract was the declaration of the wife, that 'about thirty-one years ago she went to the house of A. S. to live and keep house for him under a mutual promise and agreement, that they would sustain towards each other the relation of husband and wife, and that they did thus live and cohabit together,' it was held that there was not proof of a marriage in fact.'"

But stating that it was unnecessary to consider the evidence in said case, the court said:

"We think our statute has wholly superseded the common law, and in effect, if not in express terms, renders invalid all attempted marriages contracted in this state which have not been solemnized in substantial compliance with its provisions. The statute in force in this state in 1873, when, it is alleged, the marriage now in question occurred, is embraced in chapter 63 of our Code of 1868. The first section of said chapter provides for the issuance of marriage licenses, the third, fourth and fifth sections by whom and the manner in which marriages may be solemnized, and the sixth section is as follows:

"6. Every marriage in this state shall be under a license and solemnized in the manner herein provided; but no marriage solemnized by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such person, if the marriage be in all other respects lawful, and be consummated with a full belief on the part of such persons so married, or either of them, that they had been lawfully joined in marriage; nor shall any marriage celebrated with-

in this state between the 17th day of April, 1861, and the 1st day of January, 1866, be void by reason of the same having been solemnized without such license."

After stating that marriage is a natural right, which existed independent of statutes, and that ordinarily the statutory provisions regulating the contract of marriage should be held to be directory; that the general rule is that a marriage good at common law is valid notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity; but adding, however, that this rule is not universal (1 Bish. Mar. & Div., § 283), the court further said:

"It seems to me, therefore, that when the terms of the statute are such that they cannot be made effective to the extent of giving each and all of them some reasonable operation without interpreting the statute as mandatory, then such interpretation should be given to it. The statute under consideration, in express words, declares that 'every marriage in this state shall be under a license, and be solemnized in the manner herein provided.' It is possible that these words, standing alone, should, under the general rule just stated, be interpreted as merely directory. But the statute does not stop here. It qualified these words by provisions which would be wholly useless and unnecessary, if it were intended and should be held that the preceding provisions are simply directory. It is declared that certain marriages shall not 'be deemed or adjudged void,' because the person solemnizing them did not in fact have authority to do so. It also declares that certain other marriages shall not be void because they were solemnized without a license. These exceptions, or qualifying provisions, seem to me to be equivalent to an express declaration that marriages had in this state, contrary to the commands of the statute and not saved by the exceptions, shall be treated as void. It is apparent that the legislature must have interpreted the statute as making the excepted marriages null and void without the excepting clauses, for otherwise the exceptions would be useless and would not have been made."

In *Commonwealth v. Munson,* 127 Mass. 466; 34 Am. Rep. 411, it is stated:

"Under all changes in the form of statutes it has always been assumed in this commonwealth, and in the State of Maine, which was originally a part thereof, that (except in the single case of Quakers or Friends, whose marriages are made valid by a special provision limited to that sect, and, though not solemnized by any magistrate or minister, are witnessed, recorded and returned by the principal officer of the meeting at which the ceremony is performed) a marriage which is shown not to have been solemnized before any third person, acting, or believed by either of the parties to be acting, as a magistrate or minister, is not lawful or valid for any purpose."

And in *Norcross v. Norcross,* a late Massachusetts case, decided in January, 1892, to be found in 29 N. E. Rep. 506, it was said:

"According to the law of New Hampshire, as declared in *Dunbarton v. Franklin,* 19 N. H. 257, if parties enter into a contract of marriage between themselves, and live together in accordance with it, such facts do not constitute a marriage. We are referred to no statute or decision which shows that the law of that state has since been changed. The finding that there was no marriage under the laws of New Hampshire was therefore well warranted. The law of Massachusetts is similar, and there was nothing to show any formal ceremony of marriage here."

In that case there seems to have been some proof that no marriage ceremony was ever performed between the parties; they had cohabited as husband and wife in Massachusetts and New Hampshire, where common law marriages are not allowed; they went to New York and continued in the same apparent relation as husband and wife at one time for three days, and another time for one week, where marriages at common law are held valid, but this was held to be insufficient under the circumstances to establish the relationship, there being no evidence that the parties while in New York entered into any contract of marriage between themselves.

In *Holmes v. Holmes*, 1 Abb. (U. S.) 525, DEADY, J., says:

"The consent to become husband and wife, the contract out of which arises the relation, must be given as herein prescribed—before a person authorized to solemnize marriage, and in the presence of two witnesses. Without the observance of these formalities, the marriage relation, it seems to me, cannot be created within the States of Oregon and California, particularly the former. Neither ought it to be. To prevent fraud and litigation the law wisely requires certain contracts to be in writing and signed by the parties. A single rood of land cannot be conveyed except by the deed of the vendor. How much more important it is to society and individuals that the contract upon which rests the marriage relation, the most important of all others, should not be made except with such attending circumstances and formalities as will serve to manifest the consent of the parties beyond question, and also preserve the evidence of it. . . . Nor do I think that citizens of this state can purposely go beyond its jurisdiction, and not within the jurisdiction of another state—as at sea—and there contract marriage contrary to its laws. Such an attempt to be joined in marriage is a fraudulent evasion of the laws to which the citizen of the state is subject and owes obedience, and ought not to be held valid by them."

In *Denison v. Denison*, 35 Md. 372, ALVEY, J., says:

"By the canon law of Europe, founded mainly upon the Roman civil law, prior to the Council of Trent, in the sixteenth century, the contract of marriage was regarded as simply of a consensual nature, only differing from other contracts in its being indissoluble even by the consent of the parties. In form, a contract *per verba de præsenti*, or a promise *per verba de futuro cum copula*, constituted a valid marriage, without the offices of a priest, till the decrees of the Council of Trent, which required the intervention of the parish priest to give validity to the marriage. The promise *per verba de futuro*, when followed by carnal intercourse, was considered as equivalent in legal effect to the contract *per verba de præsenti*. In the matrimonial law, as administered by the canonist, it was a maxim, *consensus, non concubitus facit nuptias;* and this remains the law to

the present day in some parts of Europe, where the civil
and canon law prevail, and where the decrees of the Council
of Trent have not been accepted—as in Scotland."

There is considerable conflict in the authorities as to the
acts which are necessary to establish a common law mar-
riage, some courts even going to the extent of holding that
continued cohabitation alone is sufficient, while others hold
that there must have been a contract between the parties;
and others to the still further extent that this must have
been evidenced by some kind of a ceremony, or at least a
declaration to that effect in the presence of other parties.

In *Northfield v. Plymouth*, 20 Vt. 590 and 591, in speak-
ing of the case of *Cunningham v. Cunningham*, 2 Dow. 482,
REDFIELD, J., says:

"Lord Eldon and Lord Redesdale held, that in cases of
cohabitation the presumption was in favor of its legality;
but where it was known to have been illicit in its origin,
the presumption could not be made."

And after mentioning certain cases, said:

"In these stress is laid on the fact that a marriage *per
verba de præsenti* is valid in that state, and also at common
law, if followed by cohabitation, this, I think, could
hardly be regarded as law in this state, without virtually
repealing our statute upon that subject. It certainly has
never been so regarded under the English statute of 26
Geo. 2, and 4 Geo. 4, ch. 76; and I see no reason why it
should be here, when it is clearly a dispensation with all
the requisitions of the statute upon the subject. Wherever
that rule in regard to the law of marriage prevails, as it
does in Scotland, cohabitation as man and wife is marriage:
since it implies, in the strongest sense, a contract *in præ-
senti* to be husband and wife."

In *Dickerson v. Brown*, 49 Miss. 370, TARBELL, J.,
says:

"With reference to the consent necessary to     consum-
mation of marriage, it is said, nothing more is r       than

that, in language which is mutually understood, or in any mode declaratory of intention, the parties accept of each as husband and wife. And Swinburne lays down the doctrine that, if the words do not of their natural meaning, or by common use, 'conclude matrimony,' yet, if the parties intend marriage, and their intent sufficiently appears, 'they are inseparably man and wife, not only before God, but also before men.' And this 'consent may be either verbal or written; and where there was no ceremony, but the parties merely lived together as husband and wife for many years, they were held to be, in law, married.'" Citing *Hicks v. Cochran*, 4 Edw. Ch. 107.

Quoting from Mr. Bishop on Marriage and Divorce, paragraph 12, the court also said:

"The institution of marriage, commencing with the race, and attending man in all periods, in all countries of his existence, has ever been considered the particular glory of the social system. It has shone forth in dark countries, and in dark periods of the world, a bright luminary on his horizon. And but for this institution, all that is valuable, all that is virtuous, all that is desirable in human existence, would long since have faded away in the general retrograde of the race, and in the perilous darkness in which its joys and its hopes would have been wrecked together. Marriage, then, is to be cherished by the government, as the first and choicest object of its regard. Therefore, every court, in considering questions not clearly settled or defined in the law, should lean towards this institution of marriage; holding, consequently, all persons to be married who, living in the way of husband and wife, may accordingly be presumed to have intended entering into the relation, unless the rule of law which is set up to prevent this conclusion is distinct and absolute, or some impediment of nature intervenes."

In *Lewis v. Ames*, 44 Tex. 341, Roberts, C. J., says:

"A marriage is a mutual agreement of a man and woman to live together in the relation and under the duties of husband and wife, sharing each other's fate or fortune for weal or woe until parted by death, which, in organized

society is subject to certain impediments, and legalized by compliance with certain forms of law. The relation itself is natural; the prescribed impediments and the forms of laws for its legal consummation are artificial, being the work of government. What was known as and called ' marriages null in law' was a real marriage according to nature, and so intended by the parties, deficient only by the existence of some legal impediment or the want of compliance with the forms of law in contracting it. Our laws relieved against the impediment and the want of legal forms, but did not make an attempt to make concubinage marriage."

It is there held that a merely conventional arrangement for illicit intercourse and mutual assistance in living, making one a willing mistress and the other the protecting paramour was not sufficient to establish a marriage.

In *Jackson v. Winne*, 7 Wend. 50, 22 Am. Dec. 563, it is held that the marriage is complete if there has been a full, free and mutual consent between the parties, capable of contracting, to take each other as husband and wife, though not followed up by cohabitation.

In 2 Lawson, Rights, Rem. & Prac., § 711, citing various cases, it is said:

"At common law, to constitute marriage, no particular solemnization or forms were necessary. Mutual consent to enter into the relation of husband and wife was all that was essential. . . . But a marriage will not be presumed even where, for convenience, the parties hold themselves out as man and wife before third persons: *Provided,* Their cohabitation has the elements of a purely meretricious relation. Betrothal alone, followed by cohabitation, but without a present agreement to become husband and wife, does not constitute a valid marriage. An offer to prove that a man and woman lived together as husband and wife is not an offer to prove their marriage. At common law, the fact of sexual intercourse after an agreement to marry at a future day does not constitute marriage. The copula must have been in fulfillment of the agreement to marry. Where the beginning of a cohabitation is illicit, there can be no

presumption of marriage from the cohabitation and reputation." And that "circumstances of cohabitation, acknowledgment, reputation and recognition by the family, form a presumption that a connection was matrimonial and not meretricious."

In all cases, whether common law marriages are recognized or not, evidence of cohabitation and repute is admissible, as tending to show a valid marriage; holding each other out as husband and wife to the public, and continued living together in that relationship has ordinarily, if not universally, been held sufficient proof, unless contradicted, to establish it even within those states where common law marriages are not recognized. This presumption could always be rebutted, however, by showing that the parties intended their connection to be illicit, and if it was so intended at its commencement it is presumed to continue, unless evidence is produced of a change of mind. In some cases it is held that although when the connection began there was an impediment known to the parties preventing them from marrying each other, yet if they desired or intended marriage, and this desire or intention is shown to have continued after the impediment was removed, with the continuance of cohabitation, it has been held sufficient. And in 1 Bish. Mar. & Div., §§ 970, 975 and 979, citing a number of cases, it is stated:

"SEC. 970. If the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability—as when there is a prior marriage undissolved—their cohabitation, thus matrimonially meant, will, in matter of law, make them husband and wife from the moment when the disability is removed; and it is immaterial whether they know of its existence, or its removal, or not, nor is this a question of evidence."

"SEC. 975. Though a cohabitation was introduced by a formal ceremony of marriage, and the parties erroneously supposed the impediment of a former marriage to have been taken away, and never had their mistake corrected, still,

in localities where formal solemnization is not essential, valid marriage may be presumed to have occurred after the impediment was removed. To employ words more nicely accurate, and cover a larger ground, the living together of marriageable parties a single day as married, they meaning marriage, and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony."

"SEC. 979. Where a woman had formally married believing her husband to be dead, and, on his returning still continued to cohabit under the second marriage, and kept it up for several years after he really died, a second marriage after such death was presumed. And in another case, where a married man, knowing his wife to be alive, entered into a form of marriage with another woman, who did not know of the impediment, and continued the cohabitation under this second marriage until after the death of the first wife, a marriage after such death was inferred."

As an instance in which a contrary view is taken, see *Appeal of the Reading Fire Ins. and Trust Co.*, 113 Pa. St 207, 57 Am. Rep. 448. The court said:

"Undoubtedly they lived together for a long time under circumstances sufficient to prove intimate sexual relations, but cohabitation and reputation alone are not marriage. They are merely circumstances from which a marriage may sometimes be presumed. It is a presumption, however, that may be rebutted by other facts and circumstances. When the relation between a man and a woman living together is illicit in its commencement, it is presumed so to continue until a changed relation is proved. Without proof of subsequent actual marriage, it will not be presumed from continued cohabitation and reputation of a relation between them, which was of illicit origin."

Thus it will be seen that in the various cases relating to common law marriages, there is quite a difference of opinion as to just what facts and circumstances are sufficient to establish the relation. Courts undoubtedly in many instances indulge in refinements of distinctions that never entered into the minds of the parties, which sometimes resulted in

holding the marriage relation to have been established by the conduct of the parties where there was no real intention to take each other as husband and wife. There may have been no great harm in this in such instances, but it is clearly apparent that under similar circumstances where the parties, or one of them, intended to assume the relationship of husband and wife, and under no other circumstances would have consented to cohabitation, believing that the relationship thus formed by the agreement between themselves, or by cohabitation as husband and wife, and so holding themselves out to the community would be a valid marriage, have subsequently found to the shame and sorrow of one of them at least that such an arrangement constituted nothing more than an illicit cohabitation or concubinage subject to abandonment by either at pleasure.

In *Askew v. Dupree*, cited, the learned judge approves the recognition of the common law marriage, but admits that it is sometimes abused. He states, however, that rarely will the parties forego the benefits of the statute, because it adds so much to the respectability as well as the security of the contract. Here, it seems to us, a strong argument is afforded against recognizing them at all, for it is evident if the parties once understand they can form this relationship only in compliance with the statutory requirement there will be no attempt to establish it in any other manner, and the instances of resorting to cohabitation for that purpose, instead of being few, would become entirely abrogated. The decision in that case is put upon the ground that marriage is a natural right, which always existed prior to the organization of any form of government, and all laws in restraint of it should be strictly construed in consequence thereof. It is held it should be the policy of the law to sustain all such contracts and relations whenever possible, and that this should always be done unless the legislature has expressly declared all marriages entered

into or solemnized in any form other than the ways provided for in the statute void. We must remember, however, that in many ways the natural rights or privileges of mankind have to be restrained in order to promote the welfare of the community and the government of the many.

This question, involving as it does the best interests of society, and the preservation of the home and family—the foundation of all society—has ever been regarded as a most important one, but we do not think it would serve any good purpose to attempt a fuller review of the many authorities bearing upon it, as the arguments advanced are pretty fully stated in the opinions quoted from. It has been a question so often before the courts, and involved in so many contradictions and shades of distinctions, it is impossible to reconcile them, and an attempt at anything more than a limited review would be profitless. Our only desire is to interpret the law as it should be, and to arrive at a conclusion best calculated to promote the welfare of society. In order to sustain the validity of common law marriages in many of the states the courts have practically overruled the statutory law upon the subject, and we do not feel justified in following them when it results in a violation of the most ordinary rules recognized in construing statutes; nor do we think the true interests of the people lie in that direction. It is important that publicity should be given to such contracts to guard against deceptions, and to provide accessible evidence to prove the relationship. The most important of all human contracts should not be left free from all impediments or restrictions, or with no formalities requisite for its realization. Our own statutes, Gen. Stat., §§ 1381–1396, inclusive, provide how such a contract may be entered into, and the evidence thereof perpetuated. Certain persons are authorized to perform the ceremony, and it is also provided that if it be performed before an unauthorized person the validity thereof

shall not be questioned if such marriage be consummated with a belief of the persons so married, or either of them, that they have been lawfully joined in marriage. It is also provided that—

"All marriages to which there are no legal impediments, solemnized before or in any religious organization or congregation, according to the established ritual or form commonly practiced therein, are valid."

It is clear that in making provision for these excepted cases the legislature was of the opinion that all attempts to establish the relationship other than in accordance with the ways provided by the statute would be void, and would be so held. Various safeguards are thrown around the entering into this relationship, such as the requirement of a license to be first procured before any persons can be joined together as husband and wife; and should one be a girl under the age of eighteen years or a youth under the age of twenty-one years, it is provided that the license shall not issue except upon the consent of the parents or guardians. It is provided that marriage is a civil contract which may be entered into by men of the age of twenty-one years, and women of the age of eighteen years, otherwise capable; and it is provided that none under that age, respectively, shall marry except the consent of the parents or guardians shall first be obtained —those persons who are supposed to be the most interested in the welfare of the individuals most directly concerned, and who would carefully consult such interests before consenting. If common law marriages are to be recognized, this provision becomes wholly powerless, as by a simple agreement a man, though forty years a senior, and a girl of the age of twelve years, can enter into this relationship regardless of the will of the parents, or even a boy of fourteen years could be inveigled into this relationship by a woman many years his senior. It is true such in-

stances are rare, but that affords no reason why they should be tolerated in any case. While the married state is a most commendable one, and ought to be encourged in all legitimate ways, having, as it does, its origin in divine law, it seems to us if the statutory requisites are dispensed with, it would, to some extent, set a premium upon illicit intercourse. If a mere contract between the parties, to which there are no witnesses, is to be recognized as valid, it is evident that a contract thus lightly made might as easily be repudiated, or if cohabitation and reputation without any agreement constitute marriage, the former must precede the latter, for it is the cohabitation which raises the presumption and causes the reputation or assumption of the relationship of matrimony. If an agreement between the parties is to be required, with the further condition that it be made before some third person as a witness, without any other proof of it or any means provided for preserving such proof, the death of the witness removes all the evidence aside from the parties themselves. And what would be easier than for parties to agree privately to become husband and wife, and after cohabiting for a time, mutually agree to dissolve the relationship or to conceal the fact that they had ever entered into the contract, and repudiate it? It is contrary to public policy and public morals, and revolting to the senses of enlightened society that parties could place themselves in such a condition that they might mutually repudiate an arrangement of this kind previously entered into, whatever the reason might be, and yet this would follow if common law marriages are to be recognized. By adhering to the statutory provisions all objectionable cases of this kind are eliminated, parties are led to regard the contract as a sacred one, as one not lightly to be entered into, and are forcibly impressed with the idea that they are forming a relationship in which society has an interest, and to which the state is a party. Il-

licit intercourse would to a great extent be prevented, and there would be no attempts upon the part of either one to form the relationship in any clandestine way, or any attempt by one to overreach the other in such a way, knowing that such attempts would be ineffectual.

There is a growing belief that the welfare of society demands further restrictions in this direction, and that this will find a voice in future legislation; that an institution of this kind, which is so closely and thoroughly related to the state should be most carefully guarded, and that improvident and improper marriages should be prevented. All wise and healthful regulations in this direction prohibiting such marriages as far as practicable would tend to the prevention of pauperism and crime, and the transmission of hereditary diseases and defects, and it may not be regarded as too chimerical to say that in the future laws may be passed looking to this end. Certainly it is a legitimate subject for legislation, for the state has an interest in each act, contract and relation of its individual members that in any wise affects the public welfare or tends to the injury of the individual, and these will become regulated more and more in various ways as the government of man approaches greater degrees of perfection, and the rights, relations and responsibilities of one person with regard to another, and to all others, become better understood. Every thoughtful person would desire this should be so, even though in some cases it might seem to result in individual hardship.

It is true the legislature may expressly provide that all marriages not entered into in the ways pointed out by the statutes, and not within the exceptions provided for, shall be held invalid, but this affords no reason for not giving effect to the clear intention otherwise expressed in the legislation existing, because the legislature has not expressly declared all others void. Our statutes in relation hereto would, if upon any other subject, be held mandatory and prohibitive,

and we see no reason why the same effect should not be given to them here, for the law could as well say that all attempted marriages should be valid, notwithstanding the statutory requisites were not complied with.

However this question is decided, it may result in hardship in some cases, but we think the lesser injury will come from an adherence to the statutory requisites than otherwise, to the end that these contracts shall be permanent, and not revocable at the will and pleasure of the parties; that parents may be made responsible for the support, maintenance and care of their offspring, and the legitimacy of the offspring established beyond dispute. Our statute has to some extent undertaken to protect the innocent by providing that children born in unlawful wedlock shall become legitimate in case of the subsequent intermarriage of the parents, and the legislature may go still further in this direction should it be deemed advisable, even to the extent of conferring all the rights' upon them that children born of lawful wedlock have. This, although opposed to the old doctrine of preventing the parents by punishing the issue, would seem to be more in accord with principles of justice and modern ideas thereof.

Reversed and remanded.

Anders, C. J., and Dunbar, Stiles and Hoyt, JJ., concur.