# Richmond.

## OFFIELD V. DAVIS AND OTHERS.

### March 13, 1902.

1. MARRIAGE AND DIVORCE—*Common Law Marriage Void in Virginia.*—
The enactment of our statute, now section 2222 of the Code, wholly
abrogated the common law in force in this State on the subject of
marriages; and no marriage or attempted marriage, if it took place
in this State, can be held valid here unless shown to have been
under a license, and solemnized according to our statute. The lan-
guage of the statute is mandatory, and not simply directory.

2. STATUTES—*Construction—Mandatory Provisions.*—When the strict let-
ter of a statute leaves a doubt as to what is meant or intended,
the legislative intent is to be gathered from the act read as a
whole, together with other acts *in pari materia*; and, when the
whole aim of the Legislature will be plainly defeated if the direc-
tion to do an act in a particular way be not held to be exclusive of
all others, the direction will be held to be mandatory.

3. DOWER—*Judgment Against Husband Before Marriage.*—Judgments
against a man before marriage are paramount to the claim of his
widow to dower.

Appeal from a decree of the Circuit Court of Greene county,
pronounced at its June term, 1899, in several chancery suits
heard together wherein appellant filed a petition claiming dower.

*Affirmed.*

The opinion states the case.

*John E. Roller,* for the appellant.

*C. F. McMullan* and *J. E. Thrift,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The question presented on this appeal, and for the first time to this court, is, whether or not a contract, if proved, entered into between a man and a woman, *per verba de presenti*, or *per verba de futuro cum copula*, by which they mutually agreed to become husband and wife, without any celebration and without license, constitutes a valid marriage in this State, and entitles the woman to dower initiate from the time at which the agreement was entered into. In other words, is a common law marriage entered into in this State valid?

The question arises on the petition of Sarah D. Offield, appellant here, filed in a chancery suit pending in the Circuit Court of Greene county for the enforcement of judgment liens resting upon the lands of James F. Offield, in which she asserts that she became the *common law wife* of James F. Offield in April, 1865, and was regularly married to him under a license from the Clerk of the County Court of Greene county, on March 25, 1879. She alleges the death of the husband, and claims dower against his estate, from the time she became his *common law wife*, in April, 1865.

It appears that all the lands of the husband had been sold in the creditor's suit when appellant's petition was filed, except a very small portion; that the land sold, and that unsold, was insufficient to pay the liens thereon which were prior in date to March 25, 1879, the time at which appellant and James F. Offield were married in accordance with the statutory regulations in force in this State at that time, and long prior to April, 1865. If there was no valid marriage between these parties prior to March 25, 1879, then the liens asserted in the creditor's suit were paramount to appellant's claim of dower, she had no interest in the suit, and the Circuit Court rightly dismissed her petition.

As to what constitutes a common law marriage is a question that has been much controverted.

In England it has long since been held that to constitute a valid marriage, by the common law, it must be celebrated in the presence of a clergyman in holy orders. "The fact that the bridegroom himself was a clergyman in holy orders, there being no other clergyman present, did not make the marriage valid." *Beamish* v. *Beamish*, 9 H. of L. Cases, 274.

In this country, while the weight of authority is that by the common law no celebration was necessary, the view of England's highest court has been sustained in a number of States, notably Massachusetts, North Carolina, Maine, Tennessee and Maryland. In a majority of the States in which the courts of last resort have been called on to pass upon the question, it has been held that a marriage at common law is valid, notwithstanding statutory regulations as to the mode of solemnizing marriages, and the preservation of record evidence thereof, and the Supreme Court of the United States in *Meister* v. *Moore*, 96 U. S. 78, a case coming up from the Western District of Pennsylvania, but involving the validity of a common law marriage alleged to have been entered into in the State of Michigan, followed the decision of the Supreme Court of that State, in *Hutchins* v. *Kimmell*, 31 Mich. 126, construing the statute there in force concerning marriages, and holding that it had not superseded the common law.

But, in none of the States in which it has been held that a marriage not entered into in accordance with the requirements of a statute regulating the mode of entering into the contract is a valid marriage is the statute considered by the court, so far as we have been able to find, similar in its provisions to the statute in force in this State since the revision of our laws in 1849.

In the view, therefore, that we take, it is unnecessary for us to enter upon an examination of the decisions in other States as to the effect of their respective statutes upon the common law right to enter into the marital relation, as these decisions afford us little or no aid in determining the meaning and intent of our legislation upon the subject.

When a statute admits of two interpretations, the one destructive of the foundation of society, and inimical to the peace, welfare and good order of a people, and the other conducive to their welfare, and adding strength and durability to the foundations of society, the latter, we unhesitatingly think, should be adopted.

Our statute, now sec. 2222 of the Code, when read in the light of the statutes leading up to it, and which are *in pari materia,* admits, as we think, after the careful consideration that the gravity of the subject required, of but one construction. The statute is the same that was in force when it is alleged appellant became the *common law* wife of James F. Offield. It is as follows:

*"Marriage without license prohibited; when not void for want of authority in person solemnizing it.*

*"Every marriage in this State shall be under a license, and solemnized in the manner herein provided; but no marriage solemnized by any person professing to be authorized to solemnize the same shall be deemed or adjudged to be void, nor shall the validity thereof be in any way affected on account of any want of authority in such person, if the marriage be in all other respects lawful, and be consummated with a full belief on the part of the persons so married, or either of them, that they have been lawfully joined together."*

A history of this statute begins with the Act of 1631 (7 Car. I), in which nothing is said as to avoiding marriages celebrated otherwise than under a license, or after the publication of the banns, nor as to inflicting punishment upon either the parties, or the celebrant, for failure to observe the provisions of the act; nor were there any such provisions in the next succeeding act. But the Act of 1642-3, (18 Car. I), imposed a forfeiture of 1,000 lbs. of tobacco upon any minister solemnizing marriage without a license to the parties, issued from the Governor, or unless the banns had been lawfully published in the parish or

parishes where both parties resided.   This forfeiture or fine upon the minister was, by the Act of 1637 (1 Henning's Statutes, 433) increased to 10,000 lbs. of tobacco.  Then follows the Act of 1661 (14 Chas. II.), containing direct words nullifying informal marriages, and continuing the fine of 10,000 lbs. of tobacco upon a minister marrying any persons contrary to the provisions of the act.   This act continued in force till 1696, when the Act of 8 William III. was passed.  That act, including its preamble, is as follows:

*"Whereas many great and grievous mischiefs have arisen, and daily do arise, by clandestine and secret marriages, to the utter ruin of many heirs and heiresses, and to the great grief of all their relations, and whereas the laws now in force for the prevention of such marriages do inflict too small a punishment for so heinous and great an offence," Be it enacted, etc., "That no minister or ministers shall from henceforth marry any person or persons together as man and wife without lawful license, or without their publication of banns, according to the rubric in the common prayer-book, . . . and if any minister or ministers shall, contrary to this act, without such license or publication, marry any person or persons, he or they so offending shall for every such offence be imprisoned for one whole year, without bail or main-prize, and shall forfeit and pay the sum of five thousand pounds current money, one moiety to our sovereign lord the king, . . . and the other moiety to him or them that shall sue or inform for the same . . ."*

A like punishment was also imposed on the clerk who wrongfully issued license.   3 Henning's Statutes, 149-151.

It will be readily observed that it was the purpose of these enactments to prevent informal, common law marriages by imposing punishment upon the celebrant of a marriage not in conformity with the provisions of the statute, and upon a clerk who wrongfully issued a marriage license.

In the revision of the general statutes, as embodied in the

Code of 1819, no alteration in the then existing statute on the subject of marriage was made, and it remained unchanged until the adoption of the Code of 1849, when it appears, as it does also in the compilation of 1860, and in the compilation of our statutes in 1873, in the exact language of the present Code as quoted above. It omits the negative terms previously used, *i. e.*, "that no minister shall celebrate" or "no marriages shall be celebrated," etc., and enacts in plain and positive terms that "every marriage in this State shall be under a license," etc.

It appears quite significant, we think, that this provision was engrafted upon the statute at the suggestion of the revisers of the Code of 1849. In a note to their report (Report of Revisers 1849, p. 538), they recommended that whatever might be the regulations prescribed as to the mode of solemnizing marriages, or the penalty affixed for the offence of solemnizing a marriage without lawful authority, *a license should be required in all cases.* Manifestly it was their view that with this provision in the statute there could be no valid marriage in Virginia entered into without the license required by law.

The State of West Virginia has a statute in the exact language of ours, except that it has the following additional provision: "Nor shall any marriages celebrated in this State between the 17th day of April, 1861, and the 1st day of January, 1866, be void by reason of the same having been solemnized without such license." This latter clause was added, doubtless, because of the disorganized condition of all government in that State between the dates named.

In *Beverlin* v. *Beverlin,* 29 W. Va. 732, decided in 1887, this statute was construed, and in an opinion by Snyder, J., an able and learned jurist, concurred in by the entire court, it was held: First, "common-law marriages, when contracted in this State, are not recognized by our courts as valid;" and second, "No marriage in this State is valid, when it affirmatively appears that it had not been solemnized according to the requirements of

our statute on the subject, although the parties may thereafter
have associated and cohabited together as husband and wife."
The opinion reviews many of the authorities upon the subject
of common law marriages, and it is conceded that statutes regu-
lating marriages have generally and properly been construed as
directory and not mandatory; that the doctrine has become es-
tablished as a general rule, that a marriage at common law will
be held good, notwithstanding the existence of any statute on
the subject, unless the statute contains express words of nullity.
But, continues the opinion: "This rule, however, is not uni-
versal. (1 Bish. on Mar. Div., sec. 283.) It seems to me,
therefore, that when the terms of the statute are such that they
cannot be made effective to the extent of giving each and all of
them some reasonable operation without interpreting the statute
as mandatory, then such interpretation should be given to it.
The statute under consideration, in express words, declares that
'every marriage in this State shall be under a license, and be
solemnized in the manner herein provided.' It is possible that
these words, standing alone, should, under the general rule just
stated, be interpreted as merely directory. But the statute does
not stop here. It qualifies these words by provisions which would
be wholly useless and unnecessary, if it were intended and
should be held that the preceding provisions are simply direc-
tory. It is declared that certain marriages shall not 'be deemed
and adjudged void,' because the person solemnizing them did
not in fact have authority to do so. It also declares that certain
other marriages shall not be void because they were solemnized
without a license. These exceptions or qualifying provisions
seem to me to be equivalent to an express declaration that mar-
riages had in this State, contrary to the commands of the sta-
tute, and not saved by the exceptions, shall be treated as void.
It is apparent that the Legislature must have interpreted the
statute as making the marriages null and void without the ex-
cepting clauses, for otherwise the exceptions would have been

useless, and would not have been made. The introduction of the exceptions is necessarily exclusive of all other independent, extrinsic exceptions. The maxim is clear *'expressum facit cessare tacitum.'* Affirmative specifications exclude implication. (Pot. Dwarr. St. and Const. 221; 3 T. R. 442.) It is, therefore, my conclusion that no marriage or attempted marriage, if it took place in this State, can be held valid here, unless it has been shown to have been solemnized according to our statutes. It is very certain, it seems to me, that no attempted or pretended marriage can be held valid when it affirmatively appears that it has not been so solemnized."

It is said by a learned law writer that no clearer statement has been made of the law as to the dominating influence of the intention of a statute in the construction of all its parts than that which is found in Kent's Commentaries, viz: "In the exposition of a statute, the intention of the law maker will prevail over the literal sense of the terms; and its reason and intention will prevail over the strict letter. When the words are not explicit the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and the remedy in view; and the intention is to be taken or presumed according to what is consonant with reason and good discretion." Suth. on St. Const., sec. 241.

Here the learned commentator is referring to the rule governing in construing statutes to ascertain the intention of the law, when the strict letter of the statute leaves a doubt as to what was meant or intended.

Another familiar rule in construing statutes, and already adverted to, is that, in order to get at what the Legislature really did intend to direct, this intention must be sought in the whole of the act, taken together, and other acts *in pari materia.*

With reference to statutes of a different character, Enlich in his work on Interpretation of Statutes, sec. 341, states broadly the rule, that "where a statute requires that something shall be

done, or done in a particular manner or form, without expressly declaring what shall be the consequence of non-compliance, the question often arises, 'What intention is to be attributed, by inference, to the Legislature? Where, indeed, the whole aim and object of the Legislature would be plainly defeated if the command to do the thing in a particular manner did not imply a prohibition to do it in any other, no doubt can be entertained as to the intention." See also Sedg. on Inter. Sts. 375.

No reason is given, and none occurs to us, why the rule stated is not applicable to the construction of statutes similar to the one we have under consideration.

In a well considered case decided in 1892 by the Supreme Court of the State of Washington (*Re Estate of McLaughlin*, 4 Wash. 570, 16 L. R. A. 699), nearly all of the decided cases on the subject are reviewed, and it was held that a common law marriage is not valid under a statute requiring a license for a marriage, and providing that certain persons shall be authorized to perform the ceremony, and expressly providing, further, that a marriage shall not be held void because solemnized by a person not legally authorized to perform it if the parties to the marriage, or either of them, believe they are lawfully married, and also that marriages solemnized before or in any religious organization or congregation according to the ritual or form commonly practiced therein shall be valid.

While it is not set out in full in the opinion in that case, it clearly appears that the statute of the State of Washington there under review is very similar to our statute—sec. 2222, *supra.* There, as in this State, the statute provides how such a contract may be entered into, and the evidence thereof perpetuated. Certain persons are authorized to perform the ceremony, and it is also provided that if it be performed before an unauthorized person, the validity thereof shall not be questioned, if such marriage be consummated with a belief of the persons so married, or either of them, that they have been lawfully joined in marriage.

In the opinion, in *Re Estate of McLaughlin, supra,* it is well said: "While the marriage state is the most commendable one, and ought to be encouraged in all legitimate ways, having, as it does, its origin in divine law, it seems to us if the statutory requisites are dispensed with, it would, to some extent, set a premium upon illicit intercourse. If a mere contract between the parties, to which there are no witnesses, is to be recognized as valid, it is evident that a contract thus lightly made might as easily be repudiated, or if cohabitation and reputation, without any agreement, constitute marriage, the former must precede the latter, for it is the cohabitation which raises the presumption and causes the reputation or assumption of the relationship of matrimony. If an agreement between the parties is to be required, with the further condition that it be made before some third person as a witness, without any other proof of it, or any means provided for preserving such proof, the death of the witness removes all the evidence aside from the parties themselves. And what would be easier than for parties to agree privately to become husband and wife, and after cohabiting for a time, mutually agree to dissolve the relationship, or to conceal the fact that they had ever entered into the contract, and repudiate it? It is contrary to public policy and public morals, and revolting to the sense of enlightened society, that parties could place themselves in such a condition that they might mutually repudiate an arrangement of this kind previously entered into, whatever the reason might be, and yet this would follow if common law marriages are to be recognized. By adhering to the statutory provisions, all objectionable cases of this kind are eliminated, parties are led to regard the contract as a sacred one, as one not lightly to be entered into, and are forcibly impressed with the idea that they are forming a relationship in which society has an interest, and to which the State is a party. Illicit intercourse would to a great extent be prevented, and there would be no attempts upon the part of either one to form

the relationship in any clandestine way, or any attempt by one to overreach the other in such a way, knowing that such attempts would be ineffectual."

Following the leading case of *Hutchins* v. *Kimmell*, 31 Mich. 126, relied on by appellant here, and holding that common law marriages are valid, notwithstanding statutes regulating the mode in which the contract may be entered into, the marriage solemnized and a record thereof preserved, the Supreme Court of that State went so far as to say that "An actual ceremony of marriage is not essential to the establishment of the relation of husband and wife. It is sufficient that a man and a woman of due competency, and in respect to whom no impediment exists, consent to take each other as husband and wife, and actually cohabit as such." *Peet* v. *Peet*, 52 Mich. 464.

Were our statute on the subject of doubtful interpretation, we could never give our assent to this doctrine. It is wholly at variance with the ideas of our people as to the requisites of a valid marriage. The question before us involves the best interests of society, the preservation of home and family, the foundation of all society.

That no case has ever come to this court before the one we have under consideration, involving the question whether or not a common law marriage is valid in this State, is strongly persuasive that our people, from the passage of our earliest statutes on the subject of marriage, have interpreted them as mandatory, and as wholly superseding the common law on the subject. The conclusions reached in the decided cases, and by law writers, that statutes regulating marriages are to be construed as directory only, proceed upon the idea that marriage is of divine origin, and not purely of statutory origin; that marriage is dependent upon mutual consent, not upon the celebration or form by which it is entered into; that it is anterior to all forms, and was already in existence when man first began to make laws, so that the primary intent of all these acts is to regulate marriages, not to con-

fer the privilege, etc. None of these authorities, however, question the power of the Legislature, by plain language or clear implication, to declare all marriages or pretended marriages not entered into in accordance with the requirements of the statute illegal and void. "Certainly it is a legitimate subject for legislation, for the State has an interest in each act, contract, and relation of its individual members that in any way affects the public welfare, or tends to the injury of the individual, and these will become regulated more and more in various ways, as the government of man appproaches greater degrees of perfection, and the rights, relations, and responsibilities of one person with regard to another, and to all others, become better understood. Every thoughtful person would desire that this should be so, even though in some cases it might seem to result in individual hardship. It is true the Legislature may expressly provide that all marriages not entered into in the ways pointed out by the statute, and not within the exceptions provided for, should be held invalid, but this affords no reason for not giving effect to the clear intention otherwise expressed in the legislation existing, because the Legislature has not declared all others void. Our statutes in relation hereto would, if upon any other subject, be held mandatory and prohibitive, and we see no reason why the same effect should not be given here, for the law could as well say that all attempted marriages should be valid, notwithstanding the statutory requisites were not complied with. However this question is decided, it may result in hardship in some cases, but we think the lesser injury will come from an adherence to the statutory requisites than otherwise, to the end that these contracts should be made permanent, and not revocable at the will and pleasure of the parties; that parents may be made responsible for the support, maintenance, and care of their offspring, and the legitimacy of the offspring established beyond dispute." *Re Estate McLaughlin, supra.*

The law unquestionably favors marriage. As said by Bishop

(Bish. Mar. & Div., sec. 12): "The institution of marriage, commencing with the race, and attending man in all periods, in all countries of his existence, has ever been considered the particular glory of the social system. . . . And but for this institution all that is valuable, virtuous, and desirable in human existence would long since have faded away in the general retrograde of the race, and in the perilous darkness in which its joys and hopes would have been wrecked together. . . ."

But it is to be remembered that in many ways the natural rights or privileges of mankind have to be restrained in order to promote the welfare of the community, and the government of the many.

The question before us did not arise in *Scott* v. *Raub*, 88 Va. 731; *Francis* v. *Francis*, 31 Gratt. 283, or *Eldred* v. *Eldred*, 97 Va. 606, cited for appellant, and there is nothing in the opinion in either of those cases committing this court by implication, as counsel contends, to the doctrine that "an express agreement to live together," or even "an implied agreement that they should occupy to each other the relation of husband and wife," is sufficient to show that the parties "have entered the matrimonial relation in fact."

In the first two named cases, the court was dealing solely with statutes enacted with reference to marriage between emancipated slaves, and to legitimize their offspring; and in *Eldred* v. *Eldred* the question was not whether a common law marriage entered into in this State or elsewhere is valid, but whether a marriage alleged to have taken place in the city of Washington, where a marriage not celebrated in conformity with statutory requirement is by the statute declared a nullity, had in fact taken place. Hence, what was said in the opinion had reference only to the *proof* relied on to establish a marriage on a particular day—a valid marriage—according to the laws in force where the marriage was alleged to have taken place.

As was said in that case, "Our marital laws are plain and sim-

ple, not difficult to understand by the humblest citizen." They have in fact been so fully understood and lived up to since the earliest history of our government, that, as we have before stated, there is no record of a case in this court in which it was contended that a marriage in this State, entered into without conformity with the requirements of our statutes, is valid. If such a marriage in this State should be held valid, it would seem to have been a useless effort on the part of our Legislature, by certain acts passed, to protect innocent offspring of an illicit co-habitation. Secs. 2553, 2554 of the Code.

The latter clause of section 2222 of our Code applies only to the mode prescribed as to the solemnization of marriage, and in no sense qualifies the previous clause of the section prescribing that "Every marriage in this State shall be under a license, and solemnized in the manner herein provided."

We are therefore of opinion that the enactment of that statute wholly abrogated the common law in force in this State on the subject of marriages, and that no marriage or attempted marriage, if it took place in this State, can be held valid here, unless it has been shown to have been under a license, and solemnized according to our statutes.

The decree appealed from is affirmed.

*Affirmed.*