Ruffin, Chief Justice
 

 The question of evidence made in this case, is not without difficulty ; but, after the best reflection the court could bestow on it, that difficulty seems to arise rather from moral considerations than to be founded on legal principles. As far as our experience extends, or our researches into the adjudications of our sister states enable us to discover, the question is entirely new. The objection to the competency of the witness is, that she is the wife of the prisoner, and cannot be compelled or allowed to give evidence against him. The novelty of the attempt to apply this rule of the law of evidence, to this relation between slaves, is, perhaps, a sufficient reason for not yielding to it. The inclination of the courts now, is, to hear every person, who is not clearly excluded by a positive rule precisely embracing the witness offered; and thus leave the weight and effect to the jury. It might, therefore, be enough for us to say, that, although the occasion must have often been presented to them, it has never been decided by our predecessors, that the marriage of slaves, such as existed in this case, and such as usually exist in this state, consisting of cohabitation merely, by the permission of the owners, constitutes the relation of husband and wife, so as to attach to them the privileges and disabilities incident to that relation by the common law. But the court is furthermore satisfied that, upon principle, it could not be thus decided.
 

 The disqualification of husband and wife, to testify for or against each other, is merely of civil institution, upon reasons of general policy. ■ That policy has regard in the common law of England, chiefly to the peace of families, by avoiding all causes of dissension between those who,
 
 *179
 
 according to that law, are indissolubly joined together. No code could justly, by one of its edicts, pronounce that an union between two persons once formed', should by no means be severed, and yet, by another of its edicts, coerce them to acts necessarily productive of dissensions, that would deprive their union of all cordiality, separate them in feeling, and make their connexion intolerable. This privilege, accorded by the law, seems manifestly, therefore, to owe its origin to the duration of the legal obligation of the contract of marriage. It cannot be yielded to any persons but such as have entered into that contract, in that rightful and formal method which is recognized in law as binding the parties throughout life, absolutely, and independent of the continuing inclinations of one or both of them, or the continuing license of any third person. Hence a marriage
 
 de facto
 
 will not, but only a marriage
 
 de. jure,
 
 will exclude one of the parties from giving evidence for or against the other. There have, indeed, been decisions at nisi prius, in which persons not actually married, have not been allowed to give evidence
 
 for
 
 each other, because in the very transaction under investigation, they had held themselves out as man and wife. But it has never been doubted, that one was a competent witness
 
 against
 
 the other, unless a legal marriage existed; and it now seems to be finally and properly settled, that in every case, whether the witness be called by the one side or the other, the test, and the only test of competency is this: are they in fact and in law husband and wife
 
 1
 
 The rule is thus stated in Starkie’s Treaties, 2nd part, 403, and may be received as authority, because the passage has the express sanction of Ch. Justice Best, and the other judges of the Court of Common Pleas in
 
 Bathews
 
 v.
 
 Galindo,
 
 4 Bing. 610; (15 E. C. Law R. 88 ;) in which after a long cohabitation as man and wife, and the birth of children, the woman was received as a witness for the man. There can be no other rule, with certainty enough to entitle it to the name. For at what period of an illicit cohabitation shall the incompetency begin
 
 l
 
 Or how long after the cohabitation terminates, before the competency shall be restored ?
 

 In every case arising upon the question of the admissibility of husband and wife as witnesses for or against each other, whether the witness he called by the one side or the other, the test, and the only test of competency is this; are they in fact and in law husband and wife ?
 

 
 *180
 
 It being thus the common law of England, that no length of cohabitation, and no recognition by the parties merely, of each other as,pian and wife, invests them, for this purpose, • with that character; it is next to be considered whether ■a like cohabitation between slaves, constitutes, in this state, a marriage, or rather such a marriage as produces incompetency .to give evidence. It has been argued at the bar, that it does; because our laws, have not prescribed any ’ceremony or formality for the celebration of marriages >among persons of any colour or degree; and because slates are human beings, with passions and senses impelling them to this union, and with a natural capacity to contract it, s.which no ¡municipal regulation can annul, or at ¡least, which no regulation in this state professes to annul.,. It has been urged that the essence of this, as of other contracts, consists in the consent of the parties ; which it expressed before any, witnesses, in any words, or by-any ..acts, fully denoting present consent, renders the contract obligatory by the,! aw of nature and of reason; and it was thencejpferred, that it is necessarily binding in our law, in the absence of positive provisions to the contrary, ,
 

 If every position in this, .chain of reasoning were true, it would not follow that .to such a marriage contracted in ¡this state*,the effect is to be given of excluding the parties as witnesses, ^ut the court ,is, entirely satisfied, that some of those position are not correct. We do not agree .that persons
 
 mijuris
 
 are legally married merely in virtue .of their own consent, however explicitly expressed, in terms of immediate agreement, unless it be so expressed in ,, presence of those persons who are designated by law to be witnesses thereto. Ist is unnecessary to state at large the reasons on which our opinion qn this point rests ; because , no person can reflect, on the subject without perceiving that such should be the law, nor read our statutes without likewise perceiving that such is intended by the legislature to be the. law. The rule of the common, or rather the canon law, respecting marriages
 
 de
 
 facto, contracted
 
 in verbis de presentí,
 
 might well .be adopted at a time, and. in a country, in which an ecclesiastical establishment was a compotent part of the government,
 
 *181
 
 with authority, by imposing temporal penalties, and pronouncing spiritual denunciations, to compel the celebration of such a marriage
 
 in facie ecclesice,
 
 as a specific and formal execution of a contract, partly performed and binding on conscience, though not complete in law. And if one of the parties should happen to die before this duty to the other, to their issue, and to the community could be exacted, the law might in such a case, properly enough, engraft on the general rule, an exception in favour of the validity of such a contract of marriage, not duly celebrated, but continuing
 
 de facto
 
 until death parted those who had contracted. When, however, this function of the spiritual judge was abrogated in England, there arose an exigent necessity that some other fixed mode should be established by which marriage should
 
 be publicly
 
 celebrated, and some solemn memorial thereof preserved. While as to other contracts, security is provided in various ceremonies and solemnities, a well regulated state could not leave that of marriage — the most important of all, in reference to the happiness of the parties and their issue, and to the right of succession to estates — to be established or denied upon the loose testimony of perhaps a single witness, speaking entirely from memory, of the words of the parties. In this state there never was a jurisdiction similar to that of the spiritual courts in England; and it is plain from the earliest period of our legislation, that in consequence thereof, it has been constantly required as an essential requisite of a legal marriage, that. it should either be celebrated by some person in a sacred office, or be entered into before some one in a public station (and judicial trust. The very first chapter found in our oldest statute book, 1715, c. 1, contains such provisions on this subject, as one of vital importance to the prosperity of the young colony. From the terms of that act, and of those subsequently passed in 1741 and 1778, and the constant usage ever since, the court considers this to be clearly the law in this state.
 

 If that be the law of marriage between free persons, upon what principle or pretext can a marriage between slaves, not thus contracted, be sustained as a marriage
 
 de
 
 
 *182
 

 jure ?
 
 How can that be deemed to any purpose a legal marriage, which does not, in any respect, conform to the only legal regulations upon the subject of marriage ? If it be said, that the statutes relate only to the cases of free persons, and therefore do not require the marriages of slaves to be
 
 thus
 
 celebrated; the reply is obvious, that the marriage of slaves, then, is wholly pretermitted, and hence a legal marriage cannot be contracted between them. Such, indeed, may unfortunately be the law: and may have been intended by the legislature to be the law, upon the general ground of the incapacity of a slave to enter into this, as into other contracts, upon the presumption of the want of free consent, and upon the further ground of the difficulty of giving legal validity to the marriage, in respect to its most important legal incidents, without essentially curtailing the rights and powers of the masters. If it be so, it may be a fit subject for legislative interposition, to avert this melancholy addition to the misfortunes and legal disabilities of this depressed race. The subject is too full of perplexities, to authorize the court to express an opinion upon that point, without duly considering it in a case in which it shall directly arise. Assuming for the occasion, therefore, that marriage is an exception from the principle on which their contracts generally are deemed null, and that in law they may marry, yet, in the absence of particular regulations for the marriages of slaves, to give validity to a marriage contracted by them, it must be such a marriage, as, by the general law, is valid. It is not the province of a court to pronounce a contract binding, and annex to it all the consequences of another contract, to which those incidents are legally attached, only when it is attended with certain ceremonies, unless the particular contract have also those formalities. The rule, to dispense with them in particular cases, must be laid down by the makers of the law, and cannot be interpolated by its expounders. It cannot be judicially determined, that a wife by cohabitation, shall not give evidence against the man with whom she lives, more than that the other marital rights shall be accorded to them; nor, more than we can pronounce, that a man has incurred the guilt of
 
 *183
 
 bigamy, by cohabiting with one woman, under the name of his wife, after abandoning, or being forcibly separated from another, with whom he had once lived on the like terms. Unless the one consequence would follow, the other cannot; and the court is not prepared, without a mandate from a higher authority than, our own, to apply to this class of our population a rule, which would in innumerable instances, either subject them to legal criminality of a high grade, or deprive them almost entirely of their greatest solace — that of having families of their own, frail as may be the right, and temporary the enjoyment, dependent, as they are, upon the caprice of the parties themselves, and yet more upon the necessities or caprice of their owners. The opinion of the court therefore is, that the witness was never, in law, the wife of the prisoner.
 

 The inci- ' dental notice taken of the marriage of slaves, to be found in some of our statutes, for instance, in the act of 1729,
 
 (Rev. c.
 
 19,) does not legalise their marriage, so far as to affect the question of their admissibility as witnesses for or against each other.
 

 This conclusion is in no degree shaken by the incidental notices of this connection between slaves, which is found in some of our statutes. In the act of 1729,
 
 (Rev. c.
 
 19,) for instance, which provides against hunting by slaves, their travelling by night, and collecting in quarters among other persons’ negroes, the ninth section, by way of proviso to those enactments,- declares, that nothing in that act shall be construed to hinder neighbours’ negroes intermarrying together, license being first had of their several masters. This does not profess to say what shall constitute their marriage, nor what consequence such a marriage, shall draw after it. All those subjects are left to the general law. It is manifest too, from the manner in which the proviso comes in, that the object was merely to exempt from punishment particular slaves that might be found on another plantation, under the, circumstances mentioned. Thus viewed, and in reference to the general law of marriage, and also to the known usages and modes of forming this connection between slaves, this proviso can mean only that concubinage, which is voluntary on the part of the slaves, and permissive on that of the master— which, in reality, is the relation, to which these people have ever been practically restricted, and with which alone, perhaps, their condition is compatible.
 

 
 *184
 
 It may, howevér, be here observed, that the witness in this case was clearly competent, upon thesame course of argument, on which her 'incompetency was urged; for if the contract of marriage between those persons be valid, upon the ground of their agreement simply, by force of natural law, and independent of municipal regulation, it follows that its obligation and duration may and must be limited by the same means; namely, by the terms of the agreement originally made, and that it may be rescinded by a new agreement. The authority of the Divine law, as to what this agreement ought 'to be, or the duties' which, under its influence, the conscience of the parties may prompt from one to the other, are subjects With'which civil tribunals cannot deal, without the aid of municipal law. As an agreement between the parties, its extent depends upon the terms of the agreement itself, and its continued existence. In' this case’, there is no evidence that the cohabitation commenced upon any agreement— that it was to continue longer than it should be mutually
 
 satisfactory to the parties;
 
 and if
 
 there had been, it is clear
 
 that it had been dissolved by a change of inclination on each side, which had ended in an agreement' to separate, and in actual separation. Indeed, the witness had become the wife of another man, in the same sense in which she had been that of the prisoner; and is, therefore, either a competent witness, of guilty of bigamy. It is not difficult to determine between those alternatives.
 

 . A motion was also made in arrest of judgment, because the indictment concludes at common law. . Whatever doubts formerly existed on that p'oint, none have been entertained since thedeclaratory act of 1817,
 
 (Rev. c.
 
 949,) and
 
 Reed’s case,
 
 2 Hawks, 454. The very candid and discreet judge who dissented in that case, either altered his opinion, or gave it up to the authority of that adjudication. In the subsequent term, he united in the judgment in
 
 The State
 
 v.
 
 Hale,
 
 2 Hawks, 582, that an assault upon a slave, by a stranger, was an offence at common law; a judgment concurred in several times since by this court, and sanctioned by the whole country.
 

 
 *185
 
 The Court is therefore of opinion that there is no error in the record, and directs that it be thus certified to the Superior Court of Caswell, that the judgment may be executed according to law.
 

 Per Curiam. Judgment affirmed.