# IN RE ROBERTS' ESTATE
## ROBERTS ET AL. v. ROBERTS

(No. 2253; February 2, 1943; 133 Pac. (2d) 492)

For the appellant there was a brief and an oral argument by *R. R. Rose* of Casper.

For the respondents, there was a brief by *Hagens &
Wehrli* of Casper, and oral argument by *G. R. Hagens*.

BLUME, Justice.

This case arose out of a proceeding instituted in Natrona County in the matter of the estate of Ora P. Roberts, deceased, who died in June, 1940, to determine the heirship of the deceased. The petitioners claimed to be the brothers and sisters of the deceased and his sole heirs at law. Barbara Kaiser Roberts, theretofore appointed administratrix of the estate, claimed to be his widow, and, as such, entitled to all the property of the estate, since its value was said to be less than twenty thousand dollars. She claimed to have been married to the deceased on November 1, 1934, in Natrona County, Wyoming, by a so-called common law marriage, that is to say, that she and the deceased, on that day, in the presence of one William Holliday, a lawyer, now deceased, and one McKenzie, declared to each other that they would then and there be husband and wife, and that pursuant thereto they, thereafter, cohabited with each other as such. The petitioners denied that any such marriage took place. The court found against Barbara Kaiser Roberts and in favor of the petitioners, on the ground that the so-called common law marriage had not been proved and on the further ground that no such marriage is recognized under the laws of this state. Judgment was entered accordingly, from which Barbara Kaiser Roberts, hereinafter called appellant, has appealed.

We shall not pause to set out the testimony tending to show a common law marriage between the deceased and appellant, nor the testimony in contradiction thereof, but proceed at once to determine whether such marriage, when entered into in this state, is recognized as valid under our laws. That has not heretofore been determined, a few cases in which common law marriages are mentioned, as Weidenhoff v. Primm, 16 Wyo. 340, 94 Pac. 453; In Re Kiesel, 35 Wyo. 300; 249 Pac. 81; Willis v. Willis, 48 Wyo. 403, 49 P. (2d) 670, having

been disposed of on other grounds. Connors v. Connors, 5 Wyo. 433, 40 Pac. 966, has at times been considered as holding such marriages valid, but in that case there was a ceremonial marriage, a license had been issued, but it had not been recorded. This was held not to make the marriage invalid. The court by way of dictum stated that the marriage would have been valid if no license had been issued. That dictum is supported by other authorities, though there are cases to the contrary. The point is not involved herein. In the case at bar, there was a total absence of compliance or attempted compliance with the regulations prescribed by our statute. For our present purpose it is sufficient to say that a so-called common law marriage is said to be entered into by words of present assent (per verba de praesenti). In other words, it is an informal contract by the parties declaring that they are then and there husband and wife. Some of the courts require subsequent co-habitation; others do not. The subject before us has given rise to many discussions, even acrimonious in character, and to many opposite opinions. Bishop strenuously maintains the validity of such marriage, not even shrinking from the fact that it might be called concubinage. Section 396, Bishop on Marriage, Divorce and Separation. Others, on the other hand, have deplored or wondered at the fact that the contract of marriage, the most sacred of all contracts, should be treated so lightly. 2 Pollock & Maitland, History of English Law, 369; Judge Redfield, in his edition of Story, Conflict of Laws, Section 112; Dunbarton v. Franklin, 19 N. H. 244; Note 17 Eng. Ruling Case Law, 168. In the face of such different views it would be vain to hope that anything which we might say on the subject would convince anyone having the contrary opinion. But inasmuch as the ultimate authority to declare the law in this state is vested in us, we shall state our opinions and conclusions as

dispassionately as possible, knowing that if we are wrong, the Legislature has power to correct whatever errors we may commit. It has been said that the law on the subject in the United States is in a state of chaos. We cannot hope to put it in order, but if we can furnish one ray of light to penetrate the gloom, we shall be satisfied.

It has been many times stated that the idea of the validity of a common law marriage comes to us directly from the canon law and through it from the Roman law. Marriage is an institution common to the human race, and a glimpse at part of its history, momentary only as that must necessarily be, will perhaps aid us in keeping our mind at equilibrium on so controversial a subject. If the facts left to us on the pages of history have been correctly stated and if we are not amiss in the interpretation thereof, it may be safety stated that we have strong grounds for believing that at least in the last twenty-four centuries, in countries pretending to any civilization, marriage without any formality aside from the agreement of the parties has at times been tolerated but has never met with general approval. Formalities in connection with marriage did not always consist of ceremonies, though they were usual, but might, for instance, consist of written contracts, generally relating to dowry rights. In ancient Greece, ceremonies, particularly among the higher classes, were much more elaborate than with us. A dowry was thought to be necessary to be brought to the husband by the wife to mark the distinction between a wife and a concubine. Smith, Dictionary of Greek and Roman Antiquities, 3rd ed., Vol. 1, p. 692, and Vol. 2, p. 136. See Schouler, Marriage, Divorce, etc., 6th ed., Sec. 28. In ancient Rome marriages were attended by religious ceremonies performed under the auspices of the pontiff, and the idea of the sanctity of marriage, even in Ovid's day, may be gathered from

the superstition that the month of May and the first half of June were deemed unlucky for the rite. 1 Smith, supra, 142, 143. Marriage, soon, from a legal standpoint, came to consist of a mutual agreement, and the only thing necessary was to place the woman in the control of the husband. With it came the logical accompaniment of the theory of such contract, namely, divorce by agreement of the parties. Buckland, Textbook of Roman Law, 112, 117. Notwithstanding that, ceremonies, formal betrothal, and dowry instruments, were usual. Corbett, Roman Law of Marriage, p. 1; McKeldy on Roman Law, Dropie Translation, Sec. 549; Code Justinian, 5, 1; Girard, Manuel Elementaire de Droit Romain, 7th ed., 161; 1 Smith & Cheatham, Dictionary of Christian Antiquities, 458. It may be gathered from Code Justinian 5, 4, 23, 6, which provided that marriages without dowry instruments should be valid, that an opinion to the contrary had prevailed. Corbett, Roman Law of Marriage, 94. In fact, the Emperor Marjorian had enacted a law to that effect. Nov. 6, 9. Concubinage, in its outward form, was not distinguishable from marriage by agreement of the parties. Girard, supra, 161, 162. Mainly doubtless on account of slavery and because soldiers were not permitted to marry during the early part of the empire, concubinage came to be recognized since the time of Augustus as legal, without giving the woman the rights of a wife and without making the children legitimate. Constantine denounced concubinage, but, partly through the influence of the Christian Church, subsequent emperors made numerous laws on behalf of the children of such unions, and even some provisions for the concubine. Code, 5, 27; Nov. 74 and 87. The evil, or supposed evil, of concubinage, had become so great that Justinian, in Nov. 74, Ch. 4, felt himself impelled to make a new law compelling men to execute a dowry instrument or have the marriage ceremony performed

in the Christian Church, stating among other things, significantly: "It was provided by former and by our laws that marriage entered into without written marriage contracts and through mere marital intentions, should be valid and enforced. By reason of that, the Republic has become filled with fictitious contracts and witnesses come forward who lie with impunity that men and women living together have called each other husband and wife, and in this manner invent marriages which in fact were never contracted." He exempted from the law "rustics and common soldiers and the lowly and obscure." He was later compelled to modify the law, lessening its scope. Nov. 117, c. 4. Less than a century later the Visigothic Code made elaborate provisions on the subject of marriage, providing among other things that no marriage should be entered into without written dowry instruments, because "marriage is recognized to have greater dignity and honor" in such case. Translation by E. P. Scott, p. 75. And the thought that contracts of marriage by mere agreement would not be good for the interests of society, and, partially at least, to get rid of concubinage, led Leo, the philosopher in the East, about 900 A. D., Charlemagne, in the West, about 800 A. D., and King Edmund, in England, about 940 A. D., to make religious ceremony of marriage mandatory, as had been customary from early Christian times. And that, too, appears to have been true among the Visigoths. The popes, also, strove to get rid of concubinage. Beamish v. Beamish, infra; Smith & Cheatham, Dictionary of Christian Antiquities, Vol. 1, p. 422; Vol. 2, pp. 1105 and 1107; Glueck, Pandecten, 25, 428, de concubinis.

How, then, did it come about that after the struggle with concubinage above mentioned, the idea was formed or retained that marriage by mutual consent without ceremony was valid? Since that was contrary to Edmund's law, it was, in England, doubtless due

largely to the canon law, part of which at least, as ecclesiastical law, became a part of the common law of England. That, on first impression, may seem strange, but it is not so after full consideration. The law of Edmund and of Charlemagne (though the latter was confirmed in a church council in 909 A. D.) finally fell into desuetude. The Church had, almost from the beginning, encouraged marriages with religious ceremonies. Marriages entered into otherwise were, and gradually became more and more, odious to the prelates of the church. They had detested and even prohibited them. Beamish v. Beamish, infra; 2 Smith & Cheatham, supra, 1105, et seq; Kurtz, Church History, Secs. 39-1, 89-4, 104-6. But the Christian Church arose under the Roman Empire. The canon law was modeled after the Roman law, and the latter permitted so-called common law marriages and even concubinage. Christian feeling was divided between the fear of recognizing what might seem half marriages only on the one hand and the desire to sanction any union which fulfilled the primary condition of marriage on the other. It desired to convert to its faith the heathens of France, of England and of Germany, and found, during the dark and middle ages, disorganized society, free and easy marriages, and concubinage. Due partly, doubtless, to Roman tradition, partly to anxiety to keep people out of meretricious relations and to make children legitimate, and doubtless partly to the fear of driving men out of or not retaining them in the church, it recognized many clandestine unions as valid, though irregular, and presumed everything in favor of the validity thereof. Bryce, Marriage and Divorce, 3 Selected Essays in Anglo-American History, 810, 813; 1 Smith & Cheatham, supra, 422; 2 Pollock & Maitland, 366-370. And it did not prohibit marriages without religious ceremony until the Council of Trent (1545-1563). The proceedings of that Council were not ac-

cepted in France or England. However, under Henry III and Henry IV of France (1574-1606) religious ceremonies in connection with marriage became compulsory. Beamish v. Beamish, infra. And it appears that that was true as well in Protestant countries on the continent. Glueck, Pandecten, 24, p. 357. It is, however, agreed among the authorities that up to the time of the Council of Trent the canon law was that a marriage with words of present assent (per verba de praesenti) was valid. Was this part of the canon law fully accepted as part of the common law of England? The question was answered in the affirmative in Dalrymple v. Dalrymple, 2 Hadd. Const. 54 (1810), 17 Eng. Ruling Cases 11; 161 Eng. Rep. 665. The question was answered in the negative in Reg. v. Millis, 10 Cl. & Fin. 544, 8 Eng. Rep. 844, 17 Eng. Ruling Cases 66, a case carried to the House of Lords on appeal from the Irish courts, and decided in 1844. The case was referred by the House of Lords to the judges of Common Pleas, who held unanimously that the canon law of continental Europe was adopted only as modified by the customs and usages of England, a doctrine which sounds familiar to the American lawyer. Not only cases decided in the civil courts but also ecclesiastical usages, mandatory in form, were cited. And it was accordingly held that a marriage by words of present assent without intervention of the clergy was void; in other words, that a so-called common law marriage was never valid in England. The Lords voting on the question were evenly divided, but according to procedural rule, the law of that case became as mentioned. It was re-affirmed in Beamish v. Beamish, 9 House of Lords Cases 274, 11 Eng. Rep. 735. The three cases here mentioned constitute a complete treatise on the subject before us, to which little can be added. We take it that intervention of the clergy was required because no statute regulating marriage was in existence after

the law of Edmund had fallen into desuetude, leaving no other course if marriages by mere agreement were not to be upheld. The judges of the Common Pleas have been accused of being ignorant of the ecclesiastical law, and the opinion of Lord Stowell in Dalrymple v. Dalrymple has been highly extolled. Many think that the opinion in the latter case is correct and that of Reg. v. Millis unsound. 2 Pollock & Maitland, 374, et seq., argue at great length that the decision in the latter case is erroneous. We do not feel that we are competent to contradict so great an authority, and yet repeated careful comparison of Dalrymple v. Dalrymple and Reg. v. Millis may well cause one to hesitate to pronounce an unqualified judgment that the latter case, in so far as the question before us is concerned, is unsound, though we may regret the results in that case under the special facts therein. A number of authorities cited therein are hard to explain on the theory that common law marriages were recognized, and one is almost tempted to believe that the doctrine of the validity of such marriages took its main beginning from the dictum of Lord Holt in Collins v. Jessot, 6 Mod. 155, 87 Eng. Repr. 913, decided in 1705, a century after the 4th year of James II, as of which time we adopted the common law. Sec. 26-101, Wyo. Rev. St. 1931. The canon, or ecclesiastical, law was a subordinate and inferior part of the common law, and applicable in so far, and in so far only, as recognized by the courts by usage and custom. Hale, Common Law, 5th ed., 31, 32; 1 Blackst. Comm. 84. And the judges of the Common Pleas should have been in at least an equally good position as the ecclesiastical judges of knowing the extent to which the canon law had been adopted as part of the common law. Dalrymple v. Dalrymple concerns Scotch, not English, law. It attempted to state the rule under the latter, but the discussion in that connection was but incidental and

far from thorough. The only case cited which was decided before the 18th century is Bunten's Case, 4 Coke 29, 76 Eng. Repr. 950, much discussed in Reg. v. Millis. And that case, so far as we can see, in no way sustains Lord Stowell, but is, fairly construed, to the contrary. However that may be, it seems beyond question that a contract of marriage with words of present assent was at most an imperfect marriage, if it was a marriage at all. 1 Blackst. Comm. 439, states that "any contract per verba de praesenti, or in words of the present tense, and in the case of cohabitation per verba de futuro also, between persons able to contract, was, before the late act (Marriage Act of 1753), deemed a valid marriage *to many purposes, and the parties might be compelled in the spiritual courts to celebrate it in facie ecclesiae (in the face of the church)*." The words put by us in italics, unfortunately not elucidated by Blackstone, appear to have been almost entirely ignored by the courts in this country, and yet seem of importance. The purposes mentioned were, perhaps, those discussed by the Lord Chancellor in Reg. v. Millis, supra, which, as he held, gave no reciprocal property rights and did not make the children legitimate. In any event, all the authorities agree that under a marriage of that kind the parties received no reciprocal rights in the property of the other, even after death, so that, even if a common law marriage were held to be valid in this state, we could not, if we should follow the common law, give the appellant herein any rights in the property of the deceased. See 10 Law Quarterly 49; Reg. v. Millis, supra.

The opinions above mentioned, that the decision in Reg. v. Millis, supra, is unsound, are by no means unanimous. The author in 2 Univ. of Cincinnati Law Review 127, who himself appears to favor the recognition of common law marriage, but who appears to have given careful consideration to the law on the subject, states

that the so-called common law marriage in our states is not derived from the common law of England; that the rule of Reg. v. Millis is "native law," that of Dalrymple v. Dalrymple "foreign and exotic"; that the rule of Reg. v. Millis had been sustained during 700 years without exception by the common law courts; that there were in England two species of marriage, one a marriage performed with religious forms recognized and enforced by the common law courts to the exclusion of the other, and the other a contract of marriage without religious forms, but enforced in the ecclesiastical courts by compelling, under penalty, observance of religious forms thereafter. The Supreme Judicial Court of Massachusetts in 1810, in the case of Milford v. Worcester, stated that "when our ancestors left England, and ever since, it is well known that a lawful marriage there must be celebrated before a clergyman in orders." The colonial law in New York of 1684, hereinafter mentioned, bears eloquent testimony to the correctness of Reg. v. Millis. Dennison v. Dennison, 35 Md. 361 (1871), is one of the few cases in this country which have by careful examination attempted to examine the common law at the time when this country was settled, and is one of the clearest cases on the subject. It quotes at length from Swinburne, Treatise on Espousals, written in the time of Queen Elizabeth, and from Park on Dower, which show that by the common law, marriage by consent per verba de praesenti did not make the issue lawful, nor confer reciprocal property rights on the parties. The court approves the rule in Reg. v. Millis, supra, and gives an additional reason why the canon law cannot be held applicable in this country:

"The ecclesiastical polity of England forms no part of the common law as we have adopted it. We have in our system no tribunal as in England, clothed with power and jurisdiction to enforce the solemnization of marriages between the parties contracting per verba

de presenti. Unless, therefore, there can be something in the law of this state, apart from the common law of England, to render such contracts valid without solemnization, it follows, necessarily, that they can at most only be valid to the extent that they are good at common law without solemnization; and as we have seen, such unsolemnized contracts are incomplete, and are not effective to confer legitimacy upon the issue, nor the rights of property upon the parties—a right that is attempted to be enforced in this case."

This reasoning of the case was approved in Furth v. Furth, 97 Ark. 272, 133 S. W. 1037, Ann. Cas. 1912 D. 595. Parsons in Contracts (6th ed.) 84, referring to Roper on Husband and Wife, in a note, states that "I cannot but think that he places upon strong grounds his conclusion that a contract of marriage per verba de praesenti without ceremony or celebration of any kind does not constitute a valid marriage at common law."

The question of the validity of the so-called common law marriage came before the courts of this country for the first time (1809) in Fenton v. Reed (N. Y.) 4 Johns. 52. The decision is per curiam, but it is generally attributed to Chancellor Kent, then Chief Justice of the appellate court. He held that "no formal ceremony of marriage was requisite (at common law). A contract of marriage made per verba de praesenti amounts to an actual marriage and is as valid as if made in facie ecclesiae." He cited Collins v. Jessot, 6 Mod. 155, 86 Eng. Repr. 913; Wigmore's Case, 2 Salk. 437, 91 Eng. Repr. 380; and Reed v. Passer Peake 303, 170 Eng. Rep. 164, which in Reg. v. Millis, supra, were held not to express the common law rule on the subject or were explained on some other ground. It has been said that he was influenced by Dutch law, which was derived from Roman law, and by the fact that he was learned in the Roman and the Civil law. But that is not likely to be the correct explanation, in view of his personal attitude towards the rule announced by him.

Great scholar that he was, he simply, apparently, took at correct the rule announced or apparently announced in the English cases above mentioned, without further investigation. His decision is the beginning and at least partially the foundation of the doctrine of other cases as to the validity of common law marriages. It probably has had more influence in establishing that doctrine than any, other case. See, for instance, Becker v. Becker, 153 Wisc. 226; Lefkoff v. Sicro, 189 Ga. 554, 6 S. E. (2d) 687, 133 A. L. R. 738; Hall in 30 Col. Law Review 1, 6; Black in 2 Univ. Cin. Law Rev. 131. But it would seem that the decision in Fenton v. Reed, supra, was wrong. The Colonial Assembly of New York (Laws of the Colony of New York, 1665-1719, p. 150), on October 23, 1684, passed an act reciting:

"Whereas By the Law of England noe Marriage is lawfully consumated without a Minister whose Office is to joyne the partyes in matrimony after the Bands thrice published in the Church or a Lycence first had and obtained from some other person thereunto authorized all which formality cannot be duely practiced in these parts yett to the end a Decent Rule may be therein observed Bee It Enacted by the Generall Assembly and by the authority of the same" etc.

And the Assembly then provided that the intention to marry should be publicly read in the parish church or usual meeting place and might be solemnized, upon producing a license, by any minister or justice of the peace, and then provided further: "Bee it further enacted by the authority That if any man Shall p'sume to marry contrary to the Law prescribed the person offending shall be proceeded against as for fornication."

It has been thought that the colonial laws of marriage fell into desuetude. See an interesting discussion thereon in 10 L. R. App. Cas. (1805) 728 et seq. The law had not been printed in 1809, but, as stated in the preface of the volume above mentioned, remained in

force until 1828, and, together with other colonial laws, not repealed, became the law of the State of New York upon the adoption of the first Constitution in 1777. Hall in 30 Col. L. Rev. p. 3. Chancellor Kent evidently overlooked the law. He was not in favor of the rule as announced by himself in 1809, as a matter of public policy, for in his Commentaries, Vol. 2, p. 88, he referred to common law marriage as "the loose doctrine of the common law." In view of the fact that he was in favor of greater solemnization of marriages than by the mere agreement of the parties, it is altogether improbable that Fenton v. Reed would have been decided as it was had the existence of the colonial law been known. Thus, judging from the subsequent reliance on Fenton v. Reed and Kent's Commentaries, the remarkable fact appears in our jurisprudence that the doctrine on so important a subject as the validity of common law marriages in this country is at least partially based on false premises, the extent of the falsity of which being, of course, difficult to measure at this time.

The court in Reed v. Clark (1841), 8 Paige (N. Y.) 574, 579, states that "by ancient common law in England it seems that a marriage was invalid unless it was celebrated in facie ecclesiae" (citing cases), but that it was changed at the Reformation or before. The Reformation wrought changes on the question before us. In England the Church of England was substituted for the Catholic Church. Among Nonconformists and Dissenters in this country, as during Cromwell's time in England, religious ceremony was not deemed necessary or was partly condemned. Milford v. Worcester, 7 Mass. 48; 2 Univ. Cin. L. Rev. 128. The ceremony required or usual in England was, as already stated, *religious*, but too much stress has been laid by Bishop and others on that element. It must be conceded, as they hold, that the American rule is against compulsory

*religious* ceremony. However, the religious factor was but incidental. Ceremony was introduced in England, in part at least, for the purpose of publicity, and after the law of Edmund had fallen into desuetude, *religious* ceremony was deemed necessary because of the absence of any regulation by the temporal power. See Beamish v. Beamish, supra. If the colonists coming to this country had made no regulations, to take the place of religious ceremony in England, it might be plausibly urged that they approved the so-called common law marriage. But that is not the case. It is true, as Bishop, supra, Sec. 442, states, that "there must have been between the legislation and the first coming of the emigrants a time intervening when marriage without statutory help was possible." But, during that time, these emigrants would, of course, and naturally—at least wherever possible, no matter what the technical status of the common law in England may have been, adopt a ceremony according to the custom which they knew, be that according to the established church of England, or of a particular group of religious denomination, or according to Cromwell's law, which permitted magistrates to perform the marriage ceremony. In all these cases some public ceremony was usual or required. Every colony or state at some time, and some of them very early, made or adopted a substitute for—more or less variant from—the religious ceremony in England, and it would seem that the logical holding should have been, as it was in some of the states, that the marriage laws of England applied with that substitute standing in place of the religious ceremony required or at least usual in England. That would have been the logical adoption of the common law in that connection in so far as applicable to the conditions in this country. Instead of that, many courts cut the common law on this point to the bone, holding statutory regulations direc-

tory, and leaving what they have been pleased to call the canon law. The course taken by some of the courts is particularly strange when we bear in mind, as already stated, that when an agreement to marry by words of present assent was made, the ecclesiastical authorities in England could, under the rules of the canon law, compel the parties to properly solemnize the marriage. No such authority ever existed in this country. Denison v. Denison, supra. Little attention has been paid to this difference by the courts in this country, though it would seem that it should have had considerable bearing in determining the common law applicable in this country. A contractual marriage, the solemnization of which is enforceable, is one thing; one without such enforceability is another; to discard the element of enforceability, putting nothing in place of it, and leave the bare element of natural law, was a procedure which had little regard for the sanctity of marriage. The court in State v. Samuel, (1836), 19 N. C. 177, said on this subject:

"The rule of the common, or rather the canon law, respecting marriages de facto, contracted in verbis de praesenti, might well be adopted at a time and in a country, in which an ecclesiastical establishment was a component part of the government, with authority, by imposing temporal penalty, and pronouncing spiritual denunciations, to compel the celebration of such a marriage in facie ecclesiae, as a specific and formal execution of a contract, partly performed, and binding on conscience, though not complete in law. * * * When, however, this function of the spiritual judges was abrogated in England, there arose an exigent necessity that some other fixed mode should be established by which marriage should be publicly celebrated, and some solemn memorial thereof preserved. * * * In this state there never was a jurisdiction similar to that of the spiritual courts of England; and it is plain from the earliest period of our legislation, that in consequence thereof, it has been constantly required as an

essential requisite of a legal marriage, that it should either be celebrated by some person in sacred office, or be entered into before some one in public station and judicial trust."

In view of the fact that the so-called common law marriage in this country is devoid of the element of enforceability of the canon law above mentioned, the former cannot, in reality, be said to represent or be based on the latter, and Black, in 2 Univ. Cin. Law. Rev. 131, seems more nearly correct in saying that it finds its concept, its basis, in the Roman law, in which, as already pointed out, was inherent the danger of concubinage and easy divorce. We half suspect that if the non-conformists, dissenters and Puritans had been told that they were adopting such a rule of easy marriages, they would have met the charge with vigorous protest and denial. It might not be profitless to re-read Hawthorne's "Scarlet Letter."

If we should admit that marriage by mere agreement as above mentioned was valid at common law, still we must examine the provisions of our statute governing marriages. The main provisions were enacted by Ch. 71, Session Laws of 1869, now contained in Chapter 68, Rev. St. 1931. Section 1 of the original act states that "in law, marriage is considered a civil contract to which the consent of parties capable of contracting is essential." Section 2 relates to the required ages of the parties to be married, Section 3 provides that no marriage declared void under the divorce laws of the State may be *solemnized*. This referred to Chapter 10 of the Session Laws of 1869 hereafter mentioned. Section 4 states that previous to the solemnization of any marriage, a license for that purpose *"must"* be obtained from the county clerk wherein the marriage is to take place. Section 5 relates to consent of parents of minors; Sections 6 and 7 to investigation as to the competency of the parties. Section 8 provides that "every judge

and justice of the peace and every licensed or ordained preacher of the gospel may perform the ceremony of marriage. Section 9 provides as follows:

"Sec. 9. In the solemnization of marriage, no particular form shall be required, except that the parties shall solemnly declare in the presence of the magistrate or minister, and the attending witnesses, that they take each other as husband and wife, and in any case there shall be at least two witnesses beside the minister or magistrate, present at the ceremony."

Sections 10 to 13 provide for the certificate of marriage and the report of the marriage to the county clerk and the recording thereof. Sections 14 and 15 provide for exceptions to the act. The former provides that if the person performing the ceremony, professing that he is one of the persons who, under the statute, has the power to do so, does not actually have such power, still the marriage shall be valid "provided the marriage be consummated with a full belief on the part of the persons so married or either of them, that they have been lawfully joined in marriage." Section 15 provides that persons belonging to a religious society, which has its peculiar rites and customs, may be joined in marriage according to such rites and customs. Section 16 relates to the evidentiary effect of the certificate of marriage and of the record above mentioned and Section 17 recognizes the validity of marriages which are recognized as valid in other states. Further provisions were made in Chapter 10 of the Laws of 1869 relating to divorces and alimony. These laws, with some intervening changes, are now found in Chapter 35, Rev. St. 1931, and provide among other things that marriages shall be void in certain cases, for instance, when either party has a husband or wife living at the time of contracting the marriage; when either party is insane, or stands in certain relation to the other. Section 35-102, Rev. St. 1931, provides that when a marriage of a minor has

been solemnized, it may under the conditions stated in that section be deemed voidable, and provisions are made in the succeeding sections for the annulment of marriages. In 1915 the legislature passed the Workmen's Compensation Act. It provides for compensation to a surviving widow or widower only if "he or she has been regularly married by a marriage duly solemnized by a legal ceremony." Sec. 124-120(1), Rev. St. 1931. In 1921 (Sec. 103-227) the legislature provided that:

"Every male person securing a marriage license must produce a certificate dated within ten days before the date of the application for such marriage license from a licensed physician practicing in the state of Wyoming showing applicant to be free from any venereal disease in a communicable stage."

In 1931 (Sec. 68-106) the legislature required that an application for a license should not be granted till after a lapse of five days, but that the requirement might be waived in an emergency by order of the judge of the district court. This provision was repealed by Ch. 3, Session Laws of 1935, but was in force when the claimed common law marriage in this case took place. The statute, while mandatory in form in several sections, as noted, does not declare marriages entered into contrary to its provisions to be void. Bishop, supra, Sec. 424, states that a common law marriage is valid notwithstanding the existence of a statute, *unless the statute contains express words of nullity*. 2 Greenleaf, Ev., Sec. 460, is similar. The authors, singularly enough, do not appear to distinguish between marriages which are void because of total absence of compliance with the statutes, and marriages in connection with which some irregularity merely appears. They assume, apparently, that the slightest omission of the statutory requirements must either render the marriage wholly void, or none of the requirements are mandatory. That is not necessarily true. In many in-

stances some statutory provisions may be mandatory, and others, on the same subject, may be directory. A result which is reasonable is sought. Some of the cases relied on by the authors might well be regarded as presenting mere irregularities. In others the rule above mentioned was applied out of necessity. Thus in Rodebaugh v. Sanka, 2 Watts. (Pa.) 1, it appears that an early law of Pennsylvania required solemnization of marriages in presence of fourteen witnesses. The court, holding the statute directory, stated that "it is not too much to say that rigid execution of them would bastardize a vast majority of the children which have been born within the state for half a century." Dumaresly v. Fishley, 2 A. K. March (Ky.) 368, 10 Am. Dec. 76, presents a similar situation. We are not, we think, confronted with any such situation in this state which might induce us to distort the ordinary meaning of our statute, and which was a factor or contributing factor in inducing courts in other states, as, for instance, in Pennsylvania, in recognizing the validity of common law marriages. We think that our people have generally complied with our statutory provisions. In a number of states statutes similar to ours prescribing the form of marriages have been held mandatory, in part at least, though the statute contained no express words of nullity. Denison v. Denison, 35 Md. 361; Morrill v. Palmer, 68 Vt. 1, 33 Atl. 829, 33 L. R. A. 411; Dunbarton v. Franklin, 19 N. H. 257; Beverlin v. Beverlin, 29 W. Va. 732, 31 S. E. 36; Furth v. Furth, 97 Ark. 272, 133 S. W. 1037, Ann. Cas. 1912 D. 595; Offield v. Davis, 100 Va. 250, 40 S. E. 910; Huard v. McTeigh, 113 Or. 279, 232 Pac. 658, 39 A. L. R. 528; In Re McLaughlin's Estate, 4 Wash. 570, 30 Pac. 651, 16 L. R. A. 699; Milford v. Worcester, 7 Mass. 48, (1810); Bashaw v. State, 1 Yerg. (9 Tenn.) 176. Milford v. Worcester was the first case on marriage, considered in the light of the statute on the subject, and

might have been accepted by other states as the law had it not been for Fenton v. Reed, supra, and for cases which had to be decided otherwise on account of necessity. The case, however, recognizes that mere irregularities will not render a marriage invalid. In 2 Parsons on Contract (6th ed.) 81, it is stated that "the essential thing seems to be the declaration of consent by both parties, before a person authorized to receive such declaration by law." Such seems to be the law in some cases. We need not decide the point.

Turning to the various provisions of our statute, we find that Section 1 of C. 71 of the Act of 1869 provides that marriage is a civil contract. It is that, but it is also, or the contract leads to, a status, so that it is more than the ordinary contract (35 Am. Jur. 183) ; if it were not, then, as stated in Collins v. Hoag & Rollins, 122 Nebr. 805, 241 N. W. 766, it would be dissoluble at pleasure, which is not true. Too much stress should not be laid upon the first section of the act alone. The remaining sections, as we view it, provide the manner of entering into the contract, leading to the status of marriage. An attempt was made to provide for every contingency and situation, and the provisions heretofore mentioned, considered as a whole, seem to constitute a complete code on the form and requisites of marriage. Hence there is no room for the contention that statutory provisions in contravention of the common law must be strictly construed. If, as in this case, a statute covers the whole subject matter, as apparently at least it does, the abrogation of the common law on the same subject will necessarily be implied. 59 C. J. 1126. Again, it may be noted that the statute provides for cases in which a marriage will be recognized as valid notwithstanding the form prescribed in ordinary cases has not been followed. Thus a marriage according to the rites and usages of a religious society is recognized as valid if entered into by members thereof.

And though a person assuming the authority to perform the ceremony has in fact no such authority, nevertheless if the parties believe in good faith that they have been lawfully married, such marriage will be recognized. These provisions constitute exceptions. "Where a general rule is established by statute with exceptions, the court will not curtail the former, nor add to the latter by implication; and it is a general rule that an express exception excludes all others." 59 C. J. 1292. The rule was applied in In Re McLaughlin's Estate, supra; Beverlin v. Beverlin, supra; Furth v. Furth, supra. In Bashaw v. State, supra, the court applied the rule that an affirmative implies a negative —a rule mentioned in 59 C. J. 1076. In Holmes v. Holmes, 1 Sawy. 99, 1 Abb. (U. S.) 525, Fed. Cas. 6638, the court had under consideration a statute reading as follows:

"In the solemnization of marriage no particular form is required, except that the parties thereto shall assent or declare in the presence of the minister, priest, or judicial officer solemnizing the same, and in the presence of at least two attending witnesses, that they take each other to be husband and wife."

The court stated that the section was strongly indicative of the mandatory nature of the marriage laws. Our present statute (Sec. 68-109) is similar. We have set out the section (Sec. 9, c. 71, Laws of 1869) as originally enacted and as it stood till 1931. While the meaning has not been changed, the original section sounds somewhat more imperative. The phrase "and in any case there shall be at least two witnesses beside the minister or magistrate present at the ceremony," leaves little room for construction. To hold that in spite of this, no witnesses and no minister and no magistrate need be present, and that a simple contract between the parties suffices—in other words, that the negative of the provision is just as true as the positive

—would seem to be the merest mockery. There may be an excuse for other courts to so hold, who feel themselves bound by earlier precedents, but there would be none for us, when we find no precedents in this state. As stated by the Supreme Court of Washington in the well-considered case of In Re McLaughlin's Estate, supra: "In order to sustain the validity of common law marriages in many of the states, the courts have practically overruled the statutory law upon the subject, and we do not feel justified in following them when it results in the violation of the most ordinary rules recognized in construing statutes, nor do we think the true interests of the people lie in that direction. It is important that publicity should be given to such contracts, to guard against deceptions and to provide accessible evidence to prove the relationship." It has been said that "the construction of mandatory words as directory should not be lightly adopted, and never when it would in fact make a new law instead of that passed by the legislature." 59 C. J. 1073. To adopt the construction which appellant wants us to adopt would practically nullify our statute. In the ironical words of Chancellor Kent: "The regulations amount, therefore, only to legislative *recommendation* and advice. They are not *laws,* because they do not require *obedience!*" 2 Kent Comm. 89, note (a). In 1843 the question of the validity of common law marriages in South Carolina came before the Supreme Court of the United States in Lessee of Sarah J. Jewell et al., 1 How. 219. The court was evenly divided and expressed no opinion. There were statutes in South Carolina regulating marriages. Subsequent to this decision (see 2 Parsons, Contracts, 78), Chancellor Kent modified his Commentaries (2, p. 87) to read that a contract of marriage per verba de praesenti is valid *in the absence of all civil regulations to the contrary,* clearly showing that he did not consider statutory reg-

ulations to be merely advisory. Yet despite the fact that he was thereafter often cited, no attention, apparently, was paid to the statement here italicized. Counsel for appellant seems to think that, in view of the rule in so many states, for the court to declare our statute mandatory would be for us to declare a public policy which should be left to the legislature. We do not think so. We think the legislature has established that policy and that we are merely enforcing it. But if it be otherwise, still we cannot accept the conception of counsel as to the relation of courts to public policy. The law would be in a sorry state, if courts ignored it. The common law was developed from its beginning largely through public policy, as it was conceived by the courts to be and then by them declared. Holmes, Common Law, passim; see, e. g., pp. 78, 106, 154-156, 161, 181, 198, 202-205. He states on p. 35 that "every important principle which is developed in litigation is at fact and at bottom the result of more or less definitely understood views of public policy." Time and again courts have declared a rule of law as based on public policy, established, in their opinion, either by legislation, by custom or usage, or by general public opinion. True, courts have no right to establish such policy contrary to a statute. Innes v. McMichall, 59 O. S. 402, 53 N. E. 60. But law and morals, when the latter are involved, cannot be separated today any more than they have been able to be separated in the past, and that principle, itself evidently one of public policy of ancient standing, applies no less in the interpretation of statutes than in other fields, and courts will, if the statute permits, adopt that interpretation thereof which is inconsistent with neither. As stated in the Virginia case of Offield v. Davis, 100 Va. 250, 40 S. E. 910, "when a statute admits of two interpretations, the one destructive of the foundation of society, and inimical to the peace, welfare and good order of a

people, and the other conducive to their welfare, and adding strength and durability to the foundation of society, the latter, we unhesitatingly think, should be adopted." Courts, of course, may err at times as to what the welfare of the people requires. The main reason for upholding common-law marriage is that children should not be made illegitimate, and a contrary holding may occasionally visit misfortune upon them. The problem has been at least partly met by statute in West Virginia, by declaring children born of a common law marriage legitimate while at the same time rendering the marriage invalid. Kester v. Kester, 106 W. Va. 615, 146 S. E. 625. On the other hand, there are evils which would arise if common law marriages were held to be valid. Most of the cases in courts on the subject before us seemingly have involved situations like that in the case at bar. In any event the choice between the evils here mentioned, or the remedy or amelioration thereof is a legislative, not a judicial, function. Common law marriage has been condemned even in states which recognize it as valid. In Baker v. Mitchell (Pa. Super.) 17 Atl. (2d) 738, the court stated that "the law of Pennsylvania *recognizes* common law marriages. But they are a fruitful source of perjury and fraud, and in consequence, they are to be *tolerated, not encouraged.*" During the time when common-law marriages were still considered valid in Nebraska, the Supreme Court of that state in Sorenson v. Sorenson, 68 Nebr. 500, 106 N. W. 930, stated that the rule "is alien to the ideas and customs of our people. It tends to weaken the public estimate of the sanctity of the marriage relation. It puts in doubt the certainty of the rights of inheritance. It opens the door to false pretenses of marriage and the imposition upon estates of supposititious heirs. It places honest, God ordained matrimony and mere meretricious cohabitation too nearly on a level with each other." See also Collins v.

Hoag & Rollins, 122 Nebr. 805, 241 N. W. 766. In Ohio, where common law marriages are still valid, the court holds that "it contravenes public policy and should not be accorded any favor." Estate of Redman, 135 O. S. 554, 21 N. E. (2d) 659. A vigorous condemnation of such marriages is contained in an opinion in one of the lower courts of Ohio. Estate of Speeler, 6 Ohio Opinions 529, 22 Ohio Law Abstract 223. In a similar vein the Supreme Court of Oregon, in holding such marriages invalid, states (Huard v. McTeigh, 113 Or. 279, 232 Pac. 658, 39 A. L. R. 528, 537) :

"In our opinion the doctrine of common law marriages is contrary to public policy and public morals. It places a premium upon illicit cohabitation, and offers encouragement to the harlot and the adventuress. We do not sanction loose marriages or easy divorces. Good government demands that our laws be obeyed in the solemnization of marriages as in all things else. An adherence to the law in this regard will tend to cause the parties to look with respect and reverence upon a contract which is the most sacred known to man, and which ought not be lightly cast aside."

The rule upholding such marriage arose in Texas by reason of sparse settlements, long distance to places of record, bad roads, difficulties of travel, and of access to officers or ministers. Chesney v. Johnson (Tex. Civ. App.) 79 S. W. (2d) 658. The same difficulties may have aided in establishing the doctrine in other states. Those difficulties do not exist in this state, at least at this time, and furnish no reason to adopt the rule here. There can be no doubt that under present-day conditions loose marriages are not favored. We find it stated in 29 Georgetown L. J. 869, that "the great weight of modern opinion advocates the abolition in this country of common-law marriage. The American Bar Association, the Commission on Uniform State Laws and practically all authorities in the field of social reform favor

the abolition of common law marriage." To the same effect is 1 Vernier, American Family Laws, 108.

In 1875, in Hutchins v. Kimmel, 31 Mich. 126, the court cited 30 cases in support of the validity of such marriages. Twenty of these are from states in which such marriages are now illegal. While at one time it could be said that the great weight of authority in this country sustained the validity thereof, that can no longer be said to be true. Annotations and a complete collection of the cases on both sides of the subject before us are found in 39 A. L. R. 568, 60 A. L. R. 542; 94 A. L. R. 1000; 133 A. L. R. 758. In at least half of the states, and probably more, such marriages are not now valid. See 1 Vernier, supra, 106-108; 5 Ohio St. U. Law Journal 31. More than 20 years ago the court in Parke v. Parke, 25 Hawaii 397, stated.

"The modern tendency, however, is to recognize marriage as something more than a civil contract for it creates a social status or relation between the contracting parties in which not only they but the state as well are interested and involves a personal union of those participating in it of a character unknown to any other human relation and having more to do with the morals and civilization of the people than any other institution. For these reasons there is a gradual tendency to protect the parties as well as society by reasonable requirements unknown to the common law but which at the same time are not burdensome nor calculated to discourage marriage among those who ought to assume that relation."

In Huard v. McTeigh, supra, the court stated:

"The trend of modern authorities is against the recognition of common-law marriages, and it is noteworthy, in those states where the courts have given approval to the same, legislation has subsequently been enacted declaring common-law marriages null and void."

Neither our statutes, accordingly, construed according to the usual standards of interpretation, nor public

policy, would justify us in holding otherwise than that common law marriages, entered into in this state as in the case at bar, are invalid. The judgment of the trial court is accordingly affirmed.

*Affirmed.*

KIMBALL, Ch. J., concurs.
RINER, J., concurs in the result.