IN RE ESTATE OF GEORGE STOPPS.
ELIZABETH CROUSE et al., petitioners-appellants, v. ALICE M.
STOPPS, respondent-appellee.

No. 48176.

(Reported in 57 N.W.2d 221)

MARCH 10, 1953.

REHEARING DENIED MAY 8, 1953.

C. G. Lee, of Ames, and T. J. Mahoney and Robert E. Mahoney, both of Boone, for petitioners-appellants.

Doran, Doran, Doran & Erbe, of Boone, for respondent-appellee.

THOMPSON, J.—An opinion in this case was filed on November 11, 1952. It appears in 55 N.W.2d 471. Rehearing having been granted, the former opinion is withdrawn and the following substituted as the opinion of the court.

George Stopps died intestate on September 19, 1950. On the same day Alice M. Stopps applied for and was granted letters of administration upon his estate. On October 4, 1950, Elizabeth Crouse, a half sister, Robert R. Casteel and John L. Casteel, half brothers, next of kin and sole heirs of George Stopps, filed their application to set aside the appointment of Alice M. Stopps and praying for their own appointment as joint administrators. Upon trial the district court denied the application, and we have this appeal. The appellants will be known herein as the applicants, and the appellee, Alice M. Stopps, as the defendant.

The sole question involved is whether Alice M. Stopps is the widow of George Stopps. This in turn depends upon whether she was, immediately preceding his death, his common-law wife. It is her contention a common-law marriage relationship had existed between her and the decedent since July 6, 1944. The applicants concede the facts are sufficient to support the trial court's finding that a common-law marriage status existed if this type of marriage is now recognized by Iowa law. Their contentions are two: First, that common-law marriages have never been recognized in Iowa so as to give them a legal status; or if they have been we should now overrule our previous decisions and hold all attempted marriages not performed within the provisions of the Iowa Code or within the exceptions therein set up, to be void; and second, even if common-law marriages were valid in Iowa prior to the enactment of chapter 596, Code of 1950, originally chapter 292, Acts of the Forty-ninth General Assem-

bly, which went into effect on April 9, 1941, this chapter shows a clear legislative intent to outlaw and make invalid all attempted marriages not complying with its provisions.

I. Notwithstanding the most diligent efforts of applicants' counsel, we are not persuaded common-law marriages have never been recognized in Iowa, or that if they have been our previous decisions should be overruled. It is urged we have a complete marriage code, and it should be held that the legislature in enacting it intended to exclude all other possible means of marriage. With the exception of chapter 596, supra, and some sections concerning mental defectives and the making of returns by persons performing ceremonies, our law as to license requirements and ceremonial marriages has not greatly changed since the Code of 1851. The "marriage code" was about as nearly complete then and through all the intervening years as it is now, but for the exceptions noted. Yet we have repeatedly recognized and upheld common-law marriages in Iowa. It is true there has been a division of opinion in the various jurisdictions. In 55 C. J. S., Marriage, section 6, pages 816 to 818, the situation is described:

"The validity of informal or common-law marriages has been widely recognized, but in an increasing number of jurisdictions, *generally by reason of statute,* a valid marriage may not be contracted informally, although many of these jurisdictions previously recognized the validity of such marriages." (Italics ours.)

In Iowa we have recognized this type of marriage as late as Worthington v. Worthington, 238 Iowa 1044, 1046, 29 N.W.2d 186, 187, where we said: "Under these circumstances we must find that there was, in fact, a common-law marriage existing between the two."

In Love v. Love, 185 Iowa 930, 931, 171 N.W. 257, is this: "Common-law marriages have long been recognized by the law of this state." (Citing Blanchard v. Lambert, 43 Iowa 228, and McFarland v. McFarland, 51 Iowa 565.) On pages 934 and 935 of the same opinion, in upholding the finding of a common-law marriage, the court remarked: "To hold otherwise, upon the

record, would be a great injustice to the plaintiff, and illegitimize defendant's crippled daughter. The evidence of the alleged common-law marriage is persuasive * * *."

In re Estate of Wittick, 164 Iowa 485, 145 N.W. 913, a proceeding in which the right of the alleged common-law wife, as the widow of decedent, to administer his estate was involved as in the case at bar, there was a full discussion of the facts required to prove the common-law marriage status, and a holding that they had been so proven. See also Pegg v. Pegg, 138 Iowa 572, 575, 115 N.W. 1027, 1028 ("We recognize so-called common-law marriages as valid"). In re Estate of Boyington, 157 Iowa 467, 137 N.W. 949; Reppert v. Reppert, 214 Iowa 17, 241 N.W. 487, and many other cases seem to consider the common-law marriage as an accepted fact in Iowa.

But applicants-appellants say we have never analyzed the reasons for or against common-law marriages in the light of our marriage statutes; that many of our cases which seem to uphold them are no more than obiter dicta, and most if not all of them start with the presumption that this type of marriage is accepted without looking closely to see if it is so. We think it too late to retrace our steps as applicants would have us do. In Worthington v. Worthington, Love v. Love and In re Estate of Wittick, all supra, the validity of the common-law marriage was directly involved and the decision in each case turned upon that question.

In Meister v. Moore, 96 U. S. 76, 80, 81, 24 L. Ed. 826, 827, a leading case upon the subject of common-law marriages, it was urged that the Michigan statutes were complete and left no room for informal marriage; very much the same contention which applicants press upon us here. The United States Supreme Court said: "* * * the statutes are held merely directory; because marriage is a thing of common right, because it is the policy of the State to encourage it, and because, as has sometimes been said, any other construction would compel holding illegitimate the offspring of many parents conscious of no violation of law."

The court also quoted with approval from 2 Greenleaf on Evidence:

" 'Though in most, if not all, the United States there are statutes regulating the celebration of marriage rites, and inflicting penalties on all who disobey the regulations, yet it is generally considered, that, in the absence of any positive statute declaring that all marriages not celebrated in the prescribed manner shall be void * * * any marriage, regularly made according to the common law, without observing the statute regulations, would still be a valid marriage.' "

An informal marriage by contract per verba de praesenti was held valid under the law of New Jersey in Travers v. Reinhardt, 205 U. S. 423, 440, 27 S. Ct. 563, 51 L. Ed. 865, following Meister v. Moore, supra; and in Hoage v. Murch Bros. Constr. Co., 60 App. D. C. 218, 220, 50 F.2d 983, 985, the Court of Appeals of the District of Columbia said: "* * * the rule now generally recognized is that statutes requiring a marriage to be preceded by a license * * * without express words of nullity as to marriages contracted otherwise, are directory merely, and failure to procure the license or to go through a religious ceremony does not invalidate the marriage."

We have too long recognized the common-law marriage status in Iowa to change it by judicial decision. If we should accept applicants' invitation either to hold it never existed here, or to overrule our previous decisions recognizing and making it effective, we should thereby with one blow not only strike down many property rights heretofore thought determined and vested, but illegitimize many children whose status has previously been secure. There is a sound reason for adhering generally to settled principles of law. They should not be overturned lightly, nor unless they appear patently unsound and liable to cause mischief if uncorrected. The people should be able to know what the law is, and to order their affairs accordingly. We cannot abandon the rule of stare decisis except for far more impelling reasons than we find here. If the law as it has been settled by the courts and understood, not only by the legal profession but by the public generally, is to be changed, it is a task for the legislature.

II. But in any event, say the applicants, even if the common-law marriage was an institution established and recog-

nized in Iowa until the date of the enactment of chapter 292, Acts of the Forty-ninth General Assembly, supra, the so-called "blood test law", the legislature necessarily intended to abolish the common-law marriage by this statute. So, since the date when the statute became effective—April 9, 1941—preceded the time—July 6, 1944—when George Stopps and Alice M. Stopps made their informal, common-law marriage contract, it is contended that such marriage was void. It is argued it cannot be supposed that if a blood test to prove freedom from syphilis was thought by the lawmaking body to be essential, any person would be left free to avoid it by ignoring the licensing and ceremonial requirements of the statutes and resorting to the informal marriage device. We set out herewith section 596.1, Code of 1950, which contains the more important substance of the statute above referred to.

"Examination by physician. In addition to the requirements for a marriage license as set out in chapter 595, all persons making application for license to marry shall, at any time within twenty days prior to such application, be examined by a duly licensed physician in this state as to the existence of or freedom from syphilis, and it shall be unlawful for the clerk of the district court of any county in this state to issue a license to marry, except as otherwise provided in this chapter, to any person who fails to present for filing with such clerk a certificate signed by such physician setting forth that said person to the proposed marriage is either free from syphilis or not in a stage whereby it may become communicable as nearly as can be determined by a thorough physical examination and such standard microscopic and serological tests as are necessary for the discovery of syphilis."

Section 596.6 provides a criminal penalty against any clerk of the district court who shall issue a license without the physician's certificate required by chapter 596, supra, or against any person who shall obtain a license contrary to the provisions of the chapter.

Chapter 595.3, Code of 1950, deals with the requirements for a marriage license. It provides that a license must be

obtained previous to the solemnization of any marriage, and lists five situations in which the clerk of the district court must not issue the license. Section 596.1 adds another requirement, the blood test for syphilis, and a sixth prohibition or situation in which the license must not be issued; that is, when the physician's certificate showing freedom from the named venereal disease is not presented. It is another essential to the procurement of a license, but we do not find that the legislative intent to make void all marriages informally contracted without blood test or license sufficiently appears.

It is said in 55 C. J. S., Marriage, section 7, pages 819, 820: "* * * as a general rule, a statute regulating marriages is construed as directory, and does not invalidate a marriage contracted in violation of its provisions, such as an informal or common-law marriage. A marriage contracted without complying with such a statute is valid, even though the statute provides for the civil or criminal punishment of those who fail to comply with it. * * *

"A legislative intent to abrogate common-law marriages will not be presumed; it must be clearly expressed."

The rule is thus stated in 35 Am. Jur., Marriage, section 33, page 202:

"It is generally held that statutory provisions as to the formal solemnizing of marriages, and the preliminaries thereto, are directory merely, and do not affect the validity of the marriage as a common-law marriage." And on page 204: (This construction) "is generally based on the view that a common-law marriage is good, although it is not in conformity to the statutory requirements, unless the statute contains express words of nullity."

It must be taken as true that at the time chapter 292, Acts of the Forty-ninth General Assembly, now chapter 596 of the Code, was enacted, the legislature knew common-law marriages were recognized in Iowa, and that the general rule was as stated above in the quotations from 55 C. J. S. and 35 Am. Jur. Yet it did not see fit to provide that all marriages contracted in violation of the provisions of the Act should be void, a necessary

inclusion if it wished to make them so, under the authorities above-cited. It therefore seems a fair conclusion that it did not intend to abolish common-law marriages, by this statute.

The identical question involved at this point was before the Alabama Supreme Court in the case of Woodward Iron Co. v. Dean, 217 Ala. 530, 117 So. 52, 60 A. L. R. 536. The comparable Alabama statute provided no marriage license should be issued to any male person who failed to present and file a certificate of freedom from venereal disease. The court held this to be directory only and not a positive statutory prohibition having the effect of rendering a common-law marriage void. To the same effect is Boysen v. Boysen, 301 Ill. App. 573, 23 N.E.2d 231, 234.

III. The applicants-appellants, in their vigorous brief and argument, rely largely upon Roberts v. Roberts, 58 Wyo. 438, 133 P.2d 492, and Huard v. McTeigh, 113 Or. 279, 232 P. 658, 39 A. L. R. 528. In each case the validity of common-law marriages in the respective jurisdictions is considered at some length. Each case holds that, despite certain dicta in previous cases, the question was at the time an open one, and the final holding is against the legality of the marriage. We have no occasion to distinguish these cases; they place the states of Wyoming and Oregon in the category of those jurisdictions which do not recognize informal marriages, but Iowa has too long followed the opposite rule. We have examined the other authorities cited by applicants, but do not find them determinative of the problems involved.

We find no error.—Affirmed.

All JUSTICES concur.